**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Samuel SCROGGINS,
Defendant–Appellant.**

No. 88–8218.

United States Court of Appeals,
Eleventh Circuit.

July 31, 1989.

Sheila Tyler, Asst. Federal Public Defender, Atlanta, Ga., for defendant-appellant.

F. Gentry Shelnutt, Jr., Asst. U.S. Atty., Julie Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and ACKER *, District Judge.

TJOFLAT, Circuit Judge:

### I.

In November 1987, inspectors in the United States Postal Service began to investigate a number of instances in which self-service stamp vending machines had been forced open and their funds removed. During the course of the investigation, postal inspectors placed surveillance cameras at various post offices. On December 16, 1987, one of these cameras recorded Samuel Scroggins prying open and removing the funds inside a stamp vending machine located in Jonesboro, Georgia. Scroggins was subsequently arrested and agreed to talk with law enforcement officials after viewing the surveillance videotape and being advised of his rights. In the course of this interview, Scroggins voluntarily provided information concerning eighteen other postal stamp vending machine thefts that he and a number of ac-

complices had successfully committed during the months of November and December 1987.·

In reliance on this information, a grand jury indicted Scroggins on January 13, 1988 for breaking into postal stamp vending machines and stealing their contents in violation of 18 U.S.C. § 641 (1982).[1] The indictment contained two counts: the first charged Scroggins with thefts occurring between November 20 and December 15, 1987; the second charged Scroggins and an accomplice with the video-taped theft that occurred on December 16, 1987.[2] Pursuant to a plea agreement, the prosecutor dropped the charges against Scroggins contained in count one of the indictment, and the court accepted Scroggins' guilty plea as to count two. *See* Fed.R.Crim.P. 11(e)(1)(A).

Applying the guidelines promulgated by the United States Sentencing Commission, the district court sentenced Scroggins to a twelve-month term of imprisonment and a two-year term of supervised release (to be served after his release from prison).[3] *See* 18 U.S.C.A. § 3582 (West 1985 & Supp. 1989) (sentence of imprisonment); *id.* § 3583 (term of supervised release). In addition, the court ordered Scroggins to pay restitution to the United States in the amount of $11,000 to compensate for the loss that resulted from his thefts.[4] Scrog-

---

* Honorable William M. Acker, Jr., U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. 18 U.S.C. § 641 (1982) provides as follows:
   Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another ... any record, voucher, money, or thing of value of the United States or of any department or agency thereof ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both....

2. The indictment stated as follows:
   COUNT ONE
   That from on or about November 20, 1987, until on or about December 15, 1987, in the Northern District of Georgia, the defendant, SAMUEL SCROGGINS, did steal, purloin, and knowingly convert to his own use money of the United States Postal Service, having a value in excess of $100.00, in violation of Title 18, United States Code, Section 641.
   COUNT TWO

On or about December 16, 1987, in the Northern District of Georgia, the defendants, ANGELA FAYE FREEMAN, and SAMUEL SCROGGINS, aided and abetted by each other, did steal, purloin, and knowingly convert to their own use money of the United States Postal Service, having a value in excess of $100.00, in violation of Title 18, United States Code, Section 641.

3. Violations of 18 U.S.C. § 641 (1982) carry a statutory maximum sentence of ten years imprisonment and a maximum fine of $10,000. See text of statute set out *supra* note 1.

4. Under the Sentencing Reform Act of 1984, the district court has the discretion to make the payment of restitution a condition to the receipt of certain sentences. *See* 18 U.S.C.A. § 3563(b)(3) (West Supp.1989) (probation); *id.* § 3572(a)(3) (fine); *id.* § 3583(d) (supervised release); *id.* § 3556 (authorizing restitution generally). This discretion, however, is limited by the Victim and Witness Protection Act of 1982,

gins now appeals, contending that the district court incorrectly applied the guidelines in fashioning his sentence. *See id.* § 3742(a)(2).[5]

## II.

In order to understand the guideline sentencing process, one must understand the historical and jurisprudential backdrop against which the guidelines are set. We therefore begin by discussing the development of sentencing in the United States and the sentencing theory that the guidelines embody. We then proceed to a general overview of the mechanics of guideline sentencing.

### A.

Prior to the American Revolution, colonial courts fashioned sentences with three basic purposes in mind: to punish the offender for his crime, thereby satisfying society's desire for retribution ("punishment"); to deter others from committing the same crime by demonstrating its disadvantageous consequences ("general deterrence"); and to incapacitate the wrongdoer, so as to protect society from further criminal activity ("specific deterrence" or "incapacitation"). Felonies generally were punished by death; the penalty for misdemeanors ranged from being pilloried or flogged to a term of hard labor. Significantly, incarceration was not a sentencing option: the colonists accepted the prevailing belief in the basic depravity of humanity, "a feeling that made any notion of an offender's possible rehabilitation absurd." A. Campbell, The Law of Sentencing § 2, at 9 (1978) (footnote omitted).

The Revolutionary War brought with it two significant developments in sentencing theory. The first of these was the idea that certainty of punishment was a more effective deterrent to criminal conduct than severity of punishment. The second was a belief that people were rational beings, and that with proper treatment an offender could be "cured" of his "moral disease." Together, these ideas began to bring about an abolition of the harsh physical punishments previously inflicted on wrongdoers. In place of these penalties, the courts sentenced offenders to a term of confinement in a penitentiary. In these facilities, offenders were subjected to a rigorous program of hard work and moral training in hopes of correcting their criminal tendencies. *See id.* § 2. Thus, rehabilitation for the first time became an accepted goal of the sentencing process.

Beginning in the late 1800s, penological experts became dissatisfied with the sentencing system's approach to rehabilitation. They noted that in fashioning an offender's sentence, the courts generally focused on

Pub.L. No. 97–291, § 5, 96 Stat. 1248, 1253 (codified, as amended, at 18 U.S.C.A. § 3663 (West 1985 & Supp.1989)), which requires the district court to order a defendant to pay restitution to the victim of certain offenses, including those enumerated in title 18 of the United States Code.

**5.** Section 3742(a)(2) provides that a defendant may appeal his sentence on the ground that his sentence "was imposed as a result of an incorrect application of the sentencing guidelines." 18 U.S.C.A. § 3742(a)(2) (West Supp.1989). Such a challenge can take three forms. First, the defendant can assert that the sentencing court misinterpreted the guidelines in fashioning his sentence. For example, a district court might decide not to depart from the guidelines, because it believed the district courts were never permitted to do so. Or the court, after finding the relevant facts in the case, might fail to apply the guideline(s) called for by those facts. Such challenges raise pure questions of law for appellate review. Second, the defendant can question whether a given set of facts, as found by the district court, triggers the application of a particular guideline. Such a challenge presents a mixed question of law and fact for appellate review. Finally, a defendant can argue that the district court made erroneous findings of fact at the sentencing hearing, and as a consequence applied the guidelines incorrectly. The defendant would assert either that the court found facts that were not supported by the evidence or that the court failed to find facts that were firmly established by the evidence. Such a challenge, of course, would present the reviewing court with a pure question of fact. In deciding such a question—whether it be presented as a pure question of fact or in the context of an attack on the factual aspect of a mixed question of law and fact—the appellate court "shall give due regard to the opportunity of the [sentencing] court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous." *Id.* § 3742(e); *cf.* Fed.R.Civ.P. 52(a).

the seriousness of the defendant's offense, not on the offender's rehabilitative potential. This criticism eventually brought about the adoption of a "medical" sentencing model.[6] Under this model, the court sentences an offender to an indeterminate term of imprisonment, establishing only the maximum length of the offender's sentence.[7] The actual length of the term is determined by a parole board, which monitors the offender's rehabilitative progress. When it decides that the offender is fully rehabilitated, the board releases the offender on parole. Thus, rehabilitation is the dominant goal of the medical model; punishment, general deterrence, and incapacitation are achieved only incidentally to the offender's rehabilitative incarceration.

Beginning in the 1960s, courts and penological experts began to doubt the efficacy of medical model sentencing.[8] These concerns eventually came to the attention of the Congress, which initiated an extensive investigation into the state of the federal sentencing system. In 1984, this investigation concluded that the premise underlying medical model sentencing was impracticable: "We know too little about human behavior to be able to rehabilitate individuals on a routine basis or even to determine accurately whether or when a particular prisoner has been rehabilitated." S.Rep. No. 225, 98th Cong., 2d Sess. 40, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3223. Accordingly, Congress passed the Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 211, 98 Stat.1987 (codified, as amended, in scattered sections of 18 and 28 U.S.C.), which abolished medical model sen-

---

**6.** In 1869, Michigan became the first state to adopt, at least in part, the medical sentencing model; New York followed in 1878. *See* A. Dershowitz, Fair and Certain Punishment 95 (1976). In 1910, the federal government began to move toward a medical model sentencing process. *See* Act of June 25, 1910, ch. 387, 36 Stat. 819, 819–21 (creating a federal parole system). By 1930, the federal system had generally embraced the medical sentencing model. *See* Act of May 13, 1930, ch. 255, 46 Stat. 272 (creating the United States Board of Parole).

**7.** Before the implementation of the Sentencing Reform Act of 1984, sentencing of adult offenders in the federal courts was generally governed by 18 U.S.C. § 4205 (1982). This law gave the sentencing judge three options. Under section 4205(a), an offender's sentence was only partially indeterminate: the offender had to serve one-third of his sentence before he was eligible for parole, regardless of his rehabilitative progress. The federal courts normally sentenced adult offenders pursuant to this section, which was not a pure form of the medical sentencing model. Thus, by making an offender serve at least one-third of his term, section 4205(a) served, in a substantive way, the purposes of punishment, general deterrence, and incapacitation, as well as rehabilitation.

If the "ends of justice and best interest of the public" would not be served by a sentence under 4205(a), the federal courts were given two other sentencing options. Under section 4205(b)(1), the court could reduce the term of imprisonment that an offender had to serve before becoming eligible for parole to a period less than one-third the offender's total sentence. Finally, under section 4205(b)(2), the court could impose a pure indeterminate sentence, placing no minimum threshold on the offender's term of incarceration. The offender was thus immediately eligible for parole.

Three classes of offenders, however, were not subject to the provisions of 18 U.S.C. § 4205. Offenders addicted to narcotics could be sentenced under the Narcotics Addicts Act, 18 U.S.C. §§ 4251–4255 (1982), which allowed the court to bind the offender over to the custody of the Attorney General for treatment and rehabilitation. After a mandatory six months of treatment, the offender was eligible for parole. *See id.* § 4254. Young offenders could be sentenced under either of two acts, the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026 (1982), or the Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5042 (1982). Both of these acts adopted a pure medical sentencing model, under which the offender was immediately eligible for parole. *See* 18 U.S.C. §§ 5010, 5041 (1982). The Narcotics Addicts Act, the Federal Youth Corrections Act, and the Juvenile Delinquency Act were all repealed by various provisions of the Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 211, 98 Stat.1987. That Act, however, also empowers the Sentencing Commission to "study the feasibility of developing guidelines for the disposition of juvenile delinquents." 28 U.S.C.A. § 995(a)(19) (West Supp.1989).

**8.** Because of these doubts, many federal judges abandoned any attempt at fashioning sentences with regard to an offender's rehabilitative potential, and instead began to consider other goals such as retribution and general deterrence. Thus, the report accompanying the Sentencing Reform Act concluded that by 1984 the federal judiciary had no clear, unified conception as to the purposes of sentencing under the medical model. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 41 & n. 18, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3224 & n. 18.

tencing in the federal criminal justice system.

In the place of the medical model sentencing process, the Sentencing Reform Act creates a new system of sentencing based on a determinate sentencing model. Under this model, offenders are sentenced to a determinate term of incarceration. This term of incarceration is imposed to punish and to deter the offender and others from engaging in criminal conduct—not to rehabilitate the offender. *See* 28 U.S.C.A. § 994(k) (West Supp.1989) ("The Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment."). As a result, the offender must serve the full length of his term—parole and the United States Parole Commission are abolished.[9] Sentencing under the determinate model therefore is designed primarily to achieve three goals: punishment, general deterrence, and incapacitation.[10] To effect these goals, Congress created the United States Sentencing Commission and directed it to promulgate sentencing guidelines for "each category of offense" in the federal criminal code and for "each category of defendant." *See id.* § 994(b)(1). These guidelines are the centerpiece of the determinate sentencing system.

## B.

The guidelines focus first on the offense, classifying federal crimes into offense categories for sentencing purposes. For example, the sentence for any of the approximately 130 different theft offenses contained in the United States Code is governed by Sentencing Guidelines § 2B1.1 ("Larceny, Embezzlement, and Other Forms of Theft"). These offense categories evaluate the seriousness of the offense, taking into account:

(1) the grade of the offense;

(2) the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;

(3) the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;

(4) the community view of the gravity of the offense;

(5) the public concern generated by the offense;

(6) the deterrent effect a particular sentence may have on the commission of the offense by others; and

(7) the current incidence of the offense in the community and in the Nation as a whole.

28 U.S.C.A. § 994(c) (West Supp.1989). The guidelines therefore first concentrate on ensuring that the offender will receive a just punishment for his crime and that the offender's punishment will adequately deter others from committing his crime.

The guidelines focus second on the offender—specifically on the offender's criminal history. The Sentencing Commission has noted that:

---

**9.** The offender can still earn good time credits against his sentence at a rate of fifty-four days a year. *See* 18 U.S.C.A. § 3624(b) (West Supp. 1989).

**10.** Although rehabilitation is not a goal of incarceration, it does have a role in the determinate sentencing process. *See, e.g.,* S.Rep. No. 225, 98th Cong., 2d Sess. 50, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3233 (listing rehabilitation as the fourth goal of the Sentencing Reform Act). Thus, prisons will continue to offer rehabilitative programs for incarcerated offenders, who will hopefully take advantage of them. Moreover, the Sentencing Reform Act permits the sentencing judge to consider an

offender's need for rehabilitation in prescribing the conditions of probation or supervised release. *See, e.g.,* 18 U.S.C.A. § 3563(b) (West 1985 & Supp.1989) (allowing rehabilitation-oriented conditions of probation); *id.* § 3583(d) (allowing rehabilitation-oriented conditions on a term of supervised release). Similarly, the Act permits the sentencing court to consider whether an offender's ability to conform his conduct to the requirements of the law when deciding whether a sentence of probation or incarceration is appropriate. *See id.* § 3562(a) (West 1985) (incorporating by reference the rehabilitative goal expressed in 18 U.S.C.A. § 3553(a)(2)(D)).

A defendant's record of past criminal conduct is directly relevant to [sentencing] purposes. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation.

Sentencing Guidelines ch. 4, pt. A introductory commentary (Oct.1987). Thus, while the guidelines consider evidence of the offender's criminal history for purposes of punishment and general deterrence, its primary importance is to ensure that the specific defendant is deterred from future criminal conduct.

The remainder of the guidelines relates to the nature of the sentence to be imposed. The Sentencing Reform Act provides for three types of sentences: probation, fine, and imprisonment. *See* 18 U.S.C. A. §§ 3561, 3571, 3581 (West 1985 & Supp. 1989). A term of imprisonment is the predominant guideline sentence: probation can be imposed only for the most minor of offenses.

With the objectives of the Sentencing Reform Act in mind, we turn to a discussion of the mechanics of guideline sentencing.

### C.

Guideline sentencing is an adversarial process. It envisions a confrontation between the parties similar to that which occurs at a civil bench trial.[11] Accordingly, the district court begins the guideline sentencing process by determining the circumstances of the defendant's offense conduct,[12] the defendant's criminal history, and any other facts deemed relevant by the guidelines.[13] The court then proceeds to assess the severity of the defendant's offense by applying the guidelines to the facts and circumstances of the defendant's offense conduct. *See* Sentencing Guidelines § 1B1.1(a)-(e) (Jan. 15, 1988). This process yields a numeric "total offense level" that consists of three elements: a "base offense level," which reflects the seriousness of the average offense sentenced under that particular guideline; "specific offense characteristics," which increase or decrease the base offense level in light of various factors considered relevant to the defendant's offense conduct; and "adjustments," which increase or decrease the of-

---

**11.** In this regard, we note that the presentence report prepared by the court's probation service serves the purpose of a pretrial stipulation in a civil case. In this report, the probation officer sets out the facts of the case and explains how the guidelines should be applied to those facts. After the probation officer prepares the report, he submits it to the parties, who then have the opportunity to object to the probation officer's factual recitations and guideline applications. The probation officer then makes whatever changes in the presentence report that he believes are necessary, and summarizes in an addendum to the report any objections that remain—thereby enumerating the disputed factual and legal issues that the court must resolve at the sentencing hearing. *See generally* Division of Probation, Administrative Office of the United States Courts, Presentence Investigation Reports Under the Sentencing Reform Act of 1984 (1987). The court resolves these disputes by making findings of fact and conclusions of law, and on the basis thereof, fashioning a sentence. *Cf.* Fed.R.Civ.P. 52(a).

**12.** When referring to an offense, the guidelines use two similar terms: "offense conduct" and "offense of conviction." The term "offense conduct" refers to the totality of the criminal transaction in which the defendant participated and which gave rise to his indictment, without regard to the particular crimes charged in the indictment. The term "offense of conviction" is narrower in scope, referring only to the conduct charged in the indictment for which the defendant was convicted.

**13.** The guidelines place certain restrictions on what evidence is relevant for guideline sentencing purposes. *See* Sentencing Guidelines § 1B1.3 (Jan. 15, 1988). In determining whether to depart from the sentencing range prescribed by the guidelines, however, the court "may consider, without limitation, any information concerning the background, character and conduct of the defendant unless otherwise prohibited by law." *Id.* § 1B1.4.

fense level in light of certain factors considered generally relevant for sentencing purposes.[14] The resulting total offense level can range from 1 (least serious) to 43 (most serious).

Having determined the total offense level, the court next surveys the criminal history of the offender. *See id.* § 1B1.1(f). This inquiry places the defendant within a "criminal history category" that evaluates the need to increase his sentence incrementally to deter him from further criminal activity. By correlating the offense level with the offender's criminal history category on the sentencing table developed by the Sentencing Commission, the court then identifies the "guideline range" for the offender's sentence.[15] *See id.* § 1B1.1(g). In general, the district court must sentence the offender within this range; if, however, the court believes that the guideline range does not accurately reflect the seriousness of the defendant's offense or the extent of the offender's criminal history, the district court may depart from the guideline sentencing range and impose either a more lenient or more severe sentence. *See* 18 U.S.C.A. § 3553(b) (West 1985 & Supp. 1989);[16] *see also* Sentencing Guidelines § 5K2.0 (Oct.1987).

Having outlined the theory and mechanics of the guideline sentencing process, we now proceed to appellant's claims.

### III.

In sentencing appellant, the district court first assessed the severity of appellant's offense conduct by applying guideline 2B1.-

1, which controls the sentencing of theft offenses such as violations of 18 U.S.C. § 641 (1982).[17] That guideline provides as follows:

*Larceny, Embezzlement, and Other Forms of Theft*

(a) Base Offense Level: 4

(b) Specific Offense Characteristics

  (1) If the value of the property taken exceeded $100, increase the offense level as follows:

|  | Loss | Increase in Level |
|---|---|---|
| (A) | $  100 or less | no increase |
| (B) | $  101 –$ 1,000 | add 1 |
| (C) | $ 1,001 –$ 2,000 | add 2 |
| (D) | $ 2,001 –$ 5,000 | add 3 |
| (E) | $ 5,001 –$10,000 | add 4 |
| (F) | $10,001 –$20,000 | add 5 |
| (G) | $20,001 –$50,000 | add 6 |
|  | [etc.] |  |

  (4) If the offense involved more than minimal planning, increase by 2 levels.

Sentencing Guidelines § 2B1.1 (Oct.1987). In applying this guideline, the district court first enhanced appellant's offense level by five levels to reflect the loss of over $10,-000 incurred as a result of appellant's nineteen postal vending machine thefts. *See id.* § 2B1.1(b)(1)(F). The court then further increased appellant's offense level by two levels, reflecting the court's determination that appellant's offense involved more than minimal planning. *See id.* § 2B1.1(b)(4).

The court next examined whether appellant was entitled to any of the adjustments described in chapter three of the guidelines. Although the probation officer had recommended that the offense level be re-

---

**14.** Base offense levels and specific offense characteristics are defined for each offense behavior category, and are found in chapter two of the guidelines. Adjustments are contained in chapter three of the guidelines.

**15.** The most lenient guideline range recommends a sentence of no term of incarceration to a one-month term of incarceration. *See* Sentencing Guidelines ch. 5, pt. A (Oct.1987) (offense level 1, criminal history category I). When the sum of the offense level and criminal history category is 8 or higher, the guideline range requires a term of incarceration. *See id.* The most severe guideline sentence range mandates a mandatory term of life imprisonment. *See id.*

**16.** Section 3553(b) provides that:

  The court shall impose a sentence of the kind, and within the range, [provided by the guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C.A. § 3553(b) (West Supp.1989).

**17.** Appendix A of the guidelines contains an index that specifies the offense behavior guideline ordinarily applicable to the more common offenses of conviction.

duced by two levels to reflect the appellant's acceptance of responsibility, *see id.* § 3E1.1(a), the district court refused to allow such an adjustment because appellant, who had a history of cocaine use, had continued to use cocaine following his arrest.

Appellant's base offense level, special offense characteristics, and adjustments produced a total offense level of 11. An evaluation of appellant's criminal history placed him in criminal history category III. For such offenders, the guidelines prescribe a sentencing range of twelve to eighteen months. *See id.* ch. 5, pt. A. Appellant's sentence falls within this range.

The appellant raises four challenges to the district court's calculation of his offense level. We consider these challenges in their logical sequence.

### A.

■ In his first point of error, appellant contends that since he was convicted only of the December 16 theft, the district court erred in considering evidence relating to the eighteen other thefts to which he confessed. We begin our discussion by examining whether the guidelines authorized the consideration of this evidence.[18]

### 1.

The guidelines specifically delimit what evidence a court may consider in sentencing a defendant and the uses to which the court can put that evidence. At the time of

Scroggins' offense, the guidelines provided as follows:

*Relevant Conduct*

To determine the seriousness of the offense conduct, all conduct, circumstances, and injuries relevant to the offense of conviction shall be taken into account.

(a) Unless otherwise specified under the guidelines, conduct and circumstances relevant to the offense of conviction [include] acts or omissions committed or aided and abetted by the defendant ... that [ ] are part of the same course of conduct, or a common scheme or plan, as the offense of conviction....

Sentencing Guidelines § 1B1.3 (Oct.1987).[19] Having determined that appellant's November and December postal thefts were "part of the same course of conduct" as appellant's December 16 theft, the district court aggregated the loss resulting from those thefts in applying guideline 2B1.1(b)(1). We believe such aggregation was in accord with the clear language of the guideline.

In so concluding, we note that the Sentencing Commission clearly intended such a result. The amended commentary to guideline 1B1.3 states as follows:

[Guideline 1B1.3(a)] provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity, than with respect to other offenses such as

---

**18.** Critical to our resolution of this appeal is that fact that appellant never contested that he committed the eighteen other postal thefts. As we stated *supra* in the text accompanying note 11, the guidelines envision an adversarial sentencing process. Since consideration of appellant's other thefts acted to increase the guideline range for appellant's sentence significantly, the Government bore the burden of proving that appellant committed the thefts. The Government satisfied that burden by introducing appellant's confession.

Had appellant claimed, despite his confession, that he was innocent of the other eighteen thefts, the sentencing court would have had to weigh the evidence and decide whether appellant had committed the thefts. We note that neither the Sentencing Reform Act of 1984 nor the guidelines prescribe the burden of proof for such determinations, *i.e.* preponderance of the evidence, clear and convincing evidence, or

guilt beyond a reasonable doubt. We need not resolve this issue at this time.

We further note that had appellant opted for a jury trial, a verdict of not guilty on count one would have prevented the district court from considering the conduct alleged in that count in fashioning appellant's sentence on count two.

**19.** The United States Sentencing Commission amended guideline 1B1.3 effective January 15, 1988. *See* Notice of Amendments to Sentencing Guidelines, 53 Fed.Reg. 1286, 1287 (1988). In so doing, the Commission noted that the purpose of the amendment was to clarify the guideline and that "[t]he amended language restates the intent of § 1B1.3 as originally promulgated." *Id.* at 1288. We note that as applied to the facts of this case, there is no substantive difference between the October 1987 and January 1988 versions of guideline 1B1.3.

assault, robbery and burglary.... Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they are part of the same course of conduct or part of the same scheme or plan as the count of conviction. Similarly, in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction.

Sentencing Guidelines § 1B1.3 background (Jan. 15, 1988).[20] We therefore conclude that the district court did not err in considering evidence of appellant's other thefts in applying guideline 2B1.1.

Notwithstanding the provisions of guideline 1B1.3, appellant contends that consideration of his other thefts is somehow "unfair" or "inequitable." Appellant makes two arguments to this effect.

### 2.

Appellant first argues that on the facts of this case, he pled guilty only to a charge that *on December 16, 1987* he stole over $100.00 in funds belonging to the United States Postal Service. Thus, appellant believes that in considering evidence relating to his other thefts, the district court, in effect, sentenced him not only for the one theft to which he pled guilty, but for eighteen other thefts as well. Since he was not convicted of those thefts, appellant contends that the district court should not have been able to consider them in determining his offense level under the guidelines. We believe that appellant's argument reflects a basic misunderstanding of sentencing jurisprudence.

Appellant's argument implicates a fundamental question in any sentencing scheme: whether sentencing should reflect the actual conduct in which the offender engaged ("real offense" sentencing), or only the conduct with which the offender was charged and convicted ("charge offense" sentencing). Before the advent of the guidelines, the federal courts, in effect, followed a real offense system. *See* Sentencing Guidelines ch. 1, pt. A, Introduction 4(a) (Oct.1987) ("After all, the present [medical model] sentencing system is, in a sense, a real offense system."). This model placed virtually no limitations—constitutional or otherwise—on the scope of evidence that a court could consider in shaping a sentence. *See, e.g., United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) ("[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."). Indeed, the courts were encouraged to discover all they could concerning particular offenders, so as to have a better understanding of what sentence would be appropriate. Under the medical sentencing model, therefore, we have no doubt but that the district court would have been free to consider appellant's other thefts in shaping his sentence. *See, e.g., United States v. Majors*, 490 F.2d 1321, 1324 (10th Cir.1974) (sentencing judge may consider offenses the charges to which have been dismissed pursuant to a plea agreement), *cert. denied*, 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975).

The Sentencing Commission initially sought to base the guidelines on a real offense system, but found such a system impracticable. *See* Sentencing Guidelines ch. 1, pt. A introduction 4(a). As a result, the guidelines more closely resemble a

**20.** We take into account the comments to the January 1988 version of guideline 1B1.3 only to the extent that they shed light on how the Sentencing Commission originally intended the October 1987 version of guideline 1B1.3 to be interpreted. *See supra* note 19.

We note that while the loss occasioned by a series of related thefts is aggregated under the guidelines, the loss resulting from a series of related robberies is not. This result may appear incongruous, but it reflects the guidelines' position that robbery is a violent offense, threatening different persons in each instance. Thus, the guidelines require that each act of robbery be considered a separate offense. *See* Sentencing Guidelines § 1B1.3 background (Jan. 15, 1988)

charge offense system. *See id.* This charge offense system, however, contains a number of real elements:

> For one thing, the hundreds of overlapping and duplicative statutory provisions that make up the federal criminal law have forced the Commission to write guidelines that are descriptive of generic conduct rather than tracking purely statutory language. For another, the guidelines, both through specific offense characteristics and adjustments, take account of a number of important, commonly occurring real offense elements such as role in the offense, the presence of a gun, or the amount of money actually taken.

*Id.* These real offense elements do not always work to the disadvantage of a defendant; in many cases, consideration of these factors will act to reduce an offender's sentence. *See, e.g., id.* § 3B1.2 (reducing offense level if defendant had a mitigating role in the offense); *id.* ch. 3, pt. D (grouping multiple counts for sentencing purposes); *id.* § 3E1.1 (Jan. 15, 1988) (reducing offense level if defendant demonstrates an acceptance of responsibility).

Appellant argues that he was sentenced for nineteen thefts—eighteen of which did not result in a conviction. We disagree. Appellant was sentenced for the December 16 theft alone, but in assessing the seriousness of that offense the guidelines took into account the fact that appellant's offense of conviction was not an isolated event, but rather was the last of a series of offenses. The evidence of these prior thefts eliminates any argument that some concatenation of fortuitous circumstances provoked appellant into committing his offense of conviction on the spur of the moment: appellant's prior thefts establish

that he acted purposefully on December 16, having had the opportunity to consider the criminality of his act and its consequences. Such purposeful criminal conduct demands greater punishment, both to reflect society's desire for retribution and to ensure specific deterrence against future criminal conduct by appellant. In aggregating the loss occasioned by all of appellant's thefts, therefore, the guidelines reflect the full magnitude of appellant's culpability.[21]

### 3.

In arguing that consideration of his eighteen other thefts was somehow "unfair" or "inequitable," appellant makes a second argument based on the fact that his plea agreement was an empty bargain. We agree with appellant's characterization of his plea agreement, but find no error in the court's application of the guidelines.[22]

In this case, appellant was charged with two counts of theft. The first count covered the eighteen postal thefts committed by appellant before December 16; the second charged appellant with the December 16 theft alone. The government agreed not to prosecute count one, in exchange for which appellant pled guilty to count two. In fact, appellant had nothing to gain from this agreement, because whether or not he accepted it, his guideline sentence range would have been the same.

If appellant had refused the plea agreement proposed by the Government, he would have faced trial on both counts of the indictment. Assuming he had been convicted on both of these counts, the guidelines would have required that the two counts be grouped for sentencing purposes, since appellant's thefts were part of a common course of action. *See* Sentencing Guidelines § 3D1.2(b), (d) (Oct.1987).

---

**21.** We note that if accepted, appellant's argument proves too much. For example, courts have always considered a defendant's criminal history in assessing what would be an appropriate sentence. Thus, one might argue that in so doing, the courts are not sentencing a defendant for his offense of conviction, but rather for his previous crimes. As noted in the text, we think it better to view the courts as sentencing defendants for their offenses of conviction, considering defendants' criminal history only as evidence of the seriousness of the defendants' criminal conduct or the need to deter him from further crime.

**22.** Appellant does *not* argue that his plea was involuntary or that it was the result of ineffective assistance of counsel. Such arguments, of course, could be raised in a subsequent collateral attack on appellant's conviction. *See* 28 U.S.C. § 2255 (1982).

Thus, appellant's total offense level would have been calculated by considering all nineteen thefts, and although appellant would have been sentenced on both counts, the sentences would have run concurrent to one another—thus not affecting the quantum of punishment appellant would receive.[23]

In accepting the plea agreement, appellant evidently believed that the district court would not be able to consider the eighteen other thefts that were charged in count one. As we have already noted, however, guideline 1B1.3 in fact required the district court to consider those thefts in assessing the seriousness of appellant's offense of conviction. *See* discussion *supra* at III.A.1. As a result, appellant's total offense level was the same as if he had been sentenced on both counts.[24]

■ We believe that the district court's consideration of appellant's other thefts was neither unfair nor inequitable. The guidelines clearly indicate that such conduct is relevant to sentencing; thus, appellant by no means received a sentence that he could not have anticipated—to the contrary, appellant could have predicted that the court would so act. Nor did the Government's agreement to drop count one of appellant's indictment somehow impliedly preclude the district court from considering evidence of appellant's other thefts— under guideline sentencing, counsel cannot bind the sentencing discretion of the district judge or cloak the facts to reach a result contrary to the guidelines' mandate.

In sum, we conclude that the district court properly considered appellant's other thefts in applying guideline 1B1.3 and that such action was neither unfair nor inequitable.

### B.

■ In his second point of error, appellant contends that the district court erred in calculating the loss resulting from his thefts as the sum of the funds taken from the postal vending machines and the cost of repairing the damage caused to the machines by the thefts. We disagree.

As we have already noted, guideline 2B1.1 gauges the seriousness of a particular theft in large part on the loss occasioned by a defendant's offense conduct: the greater the loss, the higher the defendant's offense level. We believe that the district court properly construed "loss," as used in the context of guideline 2B1.1(b), to include property damage.

This conclusion is confirmed by an examination of the commentary to guideline 2B1.1(b). At the time of appellant's offense, the comments to guideline 2B1.1(b) stated only that "[l]oss is to be based upon replacement cost to the victim or market value of the property, whichever is greater." Sentencing Guidelines § 1B1.1 appli-

---

**23.** *The Sentencing Reform Act provides that* "[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively." 18 U.S.C.A. § 3584(a) (West 1985). The court's discretion to order consecutive sentences, however, is limited by the terms of the act, *see* 28 U.S.C.A. § 994(a)(1)(D) (West Supp.1989), which authorizes the Sentencing Commission to determine by means of the guidelines which sentences are to run concurrently and which are to run consecutively and requires the sentencing judge to abide by the Commission's determination to the same extent that the judge is required to follow the Commission's other determinations. *See* 18 U.S.C.A. § 3584(b) (West 1985). The Commission fulfilled this duty by promulgating Sentencing Guidelines § 5G1.2(d) (Oct.1987), which *states that sentences on multiple counts shall run concurrently, except in certain specified situations.* Of course, the district court has the power to depart from this provision of the guidelines, as from any other, provided the court state its reasons for so doing. *See generally* Sentencing Guidelines ch. 5, pt. K et seq. (Oct.1987).

**24.** *The only distinction between the two scenarios concerns the maximum statutory penalty that may be assessed.* By virtue of his plea agreement, appellant faced only one count of theft; at most, therefore, appellant could have received a $10,000 fine and a ten-year term of imprisonment. *If he had refused the plea agreement,* appellant would have faced this statutory maximum penalty on both counts, potentially allowing an aggregated total penalty of a $20,000 fine and a twenty-year term of imprisonment. Of course, since under the guidelines *appellant could have received at most an eighteen-month sentence, this distinction was immaterial.*

cation note 2 (Oct.1987). As subsequently amended, however, the commentary states that:

> "Loss" means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue.... When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed.

Sentencing Guidelines § 2B1.1 application note 2 (June 15, 1988). We realize, of course, that this comment was not in force at the time of appellant's offense. We nevertheless conclude that we properly may consider the comment in construing guideline 2B1.1.

Since originally promulgated in October 1987, the commentary to the guidelines has been amended several times. Such amendments no doubt will continue to be made at frequent intervals as the Sentencing Commission responds to ambiguities and interpretive problems discovered by the federal courts in applying the guidelines to the facts of particular cases. In most cases, we note that these amendments do not effect a substantive change, but rather are intended only to clarify the rule adopted by a particular guideline. Such amendments thus constitute strongly persuasive evidence of how the Sentencing Commission originally envisioned that the courts would apply the affected guideline. We therefore conclude that the courts should consider such clarifying amendments to the guidelines' commentary in interpreting the guidelines, even with regard to offenders convicted of offenses occurring before the effective date of the amendments.

### C.

■ In appellant's third argument, he contends that the district court erred in concluding that his thefts involved more than minimal planning. *See* Sentencing Guidelines § 2B1.1(b)(4) (Oct.1987). We disagree. The commentary to the guide-

lines clearly states that " '[m]ore than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." *Id.* § 1B1.1 application note 1(f). Given this standard, we do not believe that the district court was clearly erroneous in determining that the series of nineteen postal thefts committed by appellant involved more than minimal planning.

### D.

■ In his fourth challenge, appellant claims that the district court erred in refusing to adjust his sentence under guideline 3E1.1(a) to reflect acceptance of responsibility. That guideline provides as follows: "If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for the offense of conviction, reduce the offense level by 2 levels." Sentencing Guidelines § 3E1.1(a) (Oct.1987).[25] Although appellant voluntarily provided law enforcement authorities with information regarding the other postal thefts that he committed, the court nevertheless refused to reduce appellant's sentence to reflect an acceptance of responsibility for his offense. In so doing, the district court noted that appellant had continued to use cocaine after his arrest, and that the court therefore felt that appellant had not turned away from the lifestyle that had motivated his offense of conviction.

Acceptance of responsibility is a multifaceted concept that considers, among other things, the offender's recognition of the wrongfulness of his conduct, his remorse for the harmful consequences of that conduct, and his willingness to turn away from that conduct in the future. In considering whether a defendant has sincerely accepted responsibility for his offense, the court can consider a wide range of evidence. In particular, the commentary to guideline 3E1.1 states that "[i]n determining whether a defendant qualifies for this provision, appro-

---

**25.** Guideline 3E1.1(a) was amended on January 15, 1988. It now provides as follows: "If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for *his criminal conduct,* reduce the offense level by 2 levels." (Emphasis added.)

priate considerations include ... voluntary termination or withdrawal from criminal conduct or associations." *Id.* § 3E1.1 application note 1(a). We believe that the district court acted well within its discretion in concluding that appellant's continuing use of cocaine cast doubt on the sincerity of his avowed acceptance of responsibility.[26] While a defendant's continued use of narcotics does not preclude an adjustment for acceptance of responsibility, it is one indicia that the sentencing judge may consider in assessing whether the adjustment is appropriate. We therefore conclude that the district court did not err in denying appellant a sentence reduction under guideline 3E1.1(a).

### IV.

We conclude that the district court properly interpreted and applied the guidelines to the facts of appellant's offense. Accordingly, we affirm.

AFFIRMED.

Pomerance, Roger M. Olsen, David M. Moore, Gary R. Allen, Chief, Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before FAY and CLARK, Circuit Judges, and HENDERSON, Senior Circuit Judge.

---

**26.** We note that in determining whether an adjustment for acceptance of responsibility is appropriate, the guidelines indicate that the courts of appeals are to give great deference to the district court's determination. *See* Sentencing Guidelines § 3E1.1 application note 5 (Oct. 1987).