**UNITED STATES of America**

v.

**Jessie James HARRIS.**

**Crim. No. 90–245–N.**

United States District Court, M.D. Alabama, N.D.

March 15, 1991.

---

James Eldon Wilson, U.S. Atty., and Louis V. Franklin, Sr., Asst. U.S. Atty., for the U.S.

Robert H. Harris, Montgomery, Ala., for Jessie James Harris.

## ORDER

MYRON H. THOMPSON, Chief Judge.

Defendant Jessie James Harris has been convicted of mailing death threats to his former wife, in violation of 18 U.S.C.A. § 876. The government has noted two objections to the pre-sentence report submitted by the United States Probation Office. First, the government claims that Harris's offense level under the federal sentencing guidelines should be increased because the nature of his letters and his prior assaultive behavior demonstrate that he likely intended to carry out his threats; and, second, the government claims that Harris's account of both the correspondence and his conduct towards his wife do not manifest an acceptance of responsibility entitling him to a downward adjustment of this offense level.[1] For the reasons that follow, the court concludes that each of the government's objections should be sus-

---

1. There were two sentencing hearings in this cause. The government presented these objections at the second hearing on March 5, 1991, as a result of several concerns raised by the court at the first hearing on February 19, 1991. At the first hearing, the court had notified Harris and his counsel that the pre-sentence report raised a number of concerns, including the issues later set forth in the government's two objections. The court continued sentencing, informing both the government and Harris that they should be prepared to address such matters

tained and that Harris's sentence should be calculated accordingly.[2]

## I.

In late June 1990, Harris wrote and mailed to his former wife, Rosana Harris, the first of six letters threatening to kill her. During the time he sent these letters, Harris was incarcerated in federal prison in Arizona, serving a sentence for assaulting his ex-wife. Harris's menacing correspondence continued until early August 1990. The first three letters Harris sent to Rosana's parents in Iowa and the last three he mailed to her divorce lawyer in Montgomery, Alabama, instructing that each piece of correspondence be forwarded to his ex-wife.[3]

In October 1990, Harris was indicted on three counts of mailing threatening communications, in violation of 18 U.S.C.A. § 876, for the three letters that he sent to his former wife's attorney. In November 1990, he pled guilty to the first count of the indictment, with the other counts to be dismissed at the time of sentencing.

## II.

### A. Specific Offense Characteristic

■ One factor in determining a convicted defendant's sentence under the sentencing guidelines is his base offense level. In Harris's case, U.S.S.G. § 2A6.1(a) provides that the base offense level for the crime of mailing threatening communications is twelve. However, this guideline also sets forth a "specific offense characteristic" which, when applicable, requires a court to enhance this base figure. Where a defendant has "engaged in any conduct evidencing an intent to carry out such threat," this base offense level should be increased by six points. U.S.S.G. § 2A6.1(b)(1). The commentary to this section explains: "These statutes cover a wide range of conduct, the seriousness of which depends upon the defendant's intent and the likelihood that the defendant would carry out the threat. The specific offense characteristics are intended to distinguish such cases." U.S.S.G. § 2A6.1, Background.[4] As with other sections which would enhance the offense level, the government bears the burden of proving the applicability of this specific offense characteristic. *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir.1989).

■ The court finds that, by his previous violence toward his ex-wife and his two previous spouses and from the number and nature of the letters themselves, Harris

---

at the next hearing and could if they wish present evidence or file briefs on these issues. At the second hearing, the government pursued these concerns in the form of objections.

**2.** Harris has also presented two objections to the pre-sentence report. As explained in section II(A), the court in this opinion rejects one of Harris's objections: that the report contains incorrect, unsubstantiated allegations about previous acts of violence and other past conduct by Harris. In determining Harris's appropriate offense level, the court has considered *only* acts for which he has been convicted or which were proved at his sentencing hearing by a preponderance of reliable evidence. *See United States v. Ignancio–Munio*, 909 F.2d 436, 439 (11th Cir. 1990) (disputed facts at sentencing need only be proved by a preponderance of the evidence); U.S.S.G. § 6A1.3(a) ("In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to sup-

port its probable accuracy"). Similarly, the court also finds that Harris's other objection to the pre-sentence report is without merit; contrary to Harris's contention, U.S.S.G. § 4A1.1(d)–(e) requires that his criminal history score be enhanced three points because he committed this offense while in prison.

**3.** Harris's wife had retained a lawyer to seek a divorce from Harris. However, she subsequently learned that her previous marriage, contrary to what she had believed, was not dissolved until 1990, five years after she wed Harris. Accordingly, a Montgomery County court has issued a decree declaring that there was and is no valid marriage between the two.

**4.** Similarly, U.S.S.G. § 2A6.1, Application Note 1 provides that

this offense includes a particularly wide range of conduct and ... it is not possible to include all of the potentially relevant circumstances in the offense level. Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted.

has engaged in conduct which reflects that he intended to carry out his repeated threats to harm his former wife. Indeed, the fact that Harris has been incarcerated since 1988 is more than likely all that has prevented him from fulfilling his promises to murder Rosana.

A brief examination of these letters reveals that Harris's death threats were pointed and unambiguous, and, indeed, grew more heated and enraged with the passage of time. In his first letter to his ex-wife, mailed to her parents on June 26, 1990, Harris wrote:

> I am going to kill Roseana very soon I am out of that hell hold place ... I am going to kill Roseanna you can tell her for me I am soon I know where she is and work and stay ... give this to Roseanna and tell her that I am going to kill her ... I am going to kill her she wont live to see her next birthday.[5]

Along with this letter, Harris enclosed a copy of a news article entitled, "No Way Out," whose subtitle read: "Each year, hundreds of women are killed by ex-husbands or boyfriends who stalk them obsessively, undeterred by police or court orders." On the top margin of the article, Harris wrote: "I am going to kill you soon Rose." In a second and third letter to his former wife's parents, mailed by Harris on July 9 and 10, 1990, he discussed rationally and in detail his plans to enable his in-laws to gain custody of his and his ex-wife's two children after he had murdered Rosana. Moreover, he repeated his threats with greater emphasis:

> If I cant have her no one will tell Rosana to stop the divorce if she want to live her choice to live with us or die ... I will kill her if she dont stop this divorce I swear to God that I will kill her ... I am out now tell Rosana this.[6]

Again, Harris attached to these letters a copy of the "No Way Out" magazine article about men who murder their wives.

In his fourth letter, sent to his former wife's divorce lawyer, Harris wrote:

> While you are at the lawyer office make out a will ... are you prepared to die you are going to die very soon I swear to God cops, restraining orders, divorce no one can save you from me I know where you live, work and your Company at in Montgomery.

Harris's fifth letter, which again included a copy of the "No Way Out" article, this time with a description of one enraged husband's shotgun murder of his wife underlined, read:

> ... you are getting a divorce. I will kill you first.... I can't have you no one will ... Remember in Hawaii when you gat a restraining order barring me from contacting you and the kids, I came home with the gun you were sound a sleep. I could have kill you then cops, restraining orders, divorce no one can save you from me. I know where you live, and work, and your Company at in Montgomery Alabama. You say that you are frightened of me you dam will better be I will kill you ... while you are at the lawyer office make out a will ... are you prepared to die, you are going to die very soon I swear to God that I will kill you ... I am out I will see you ... soon look for me I see you but you dont see me are you prepared to die.

The sixth and final letter written by Harris, which was received on August 6, 1990, was also the most angry and frightening one:

> Rose I am going to kill you and I wont you to know this. I testified that I would sooner blow your brains out before I let you have my sons. You are an evil obsessed woman who constructed a grand scheme to deprive me of my sons and in the process rob me of my career, reputation, and livelihood. Also you are a bigamist, a pathetic, and gravely sick psychopath who can purge herself only by confessing ... I swear to God that I

---

**5.** The court quotes Harris's letters as they are written.

**6.** In other letters, Harris also wrote that he was no longer in prison, and provided a Georgia address where he could be reached. In fact, however, he was still incarcerated in federal prison in Arizona when he mailed each of the six letters. Harris was scheduled to be released from prison in February 1991, but is still detained pending sentencing in this case.

am going to kill you for what you did to me ... you will be dead ... as soon as I fine you, you are dead.

Harris's history of violence against his former wife and other women strongly indicates that his threats were not merely idle ones. In May 1989, Harris pled guilty in federal court in Hawaii to assault with a dangerous weapon and unlawful possession of a firearm, and was sentenced to 33 months in prison, a term he was serving at the time he wrote these menacing letters to his ex-wife. These convictions arose out of two incidents involving violent conduct by Harris against his former wife.[7] In August 1988, Harris attacked Rosana by striking her repeatedly in the face with a telephone and then choking her, causing her to bleed and eventually to black out.[8] When she regained consciousness and attempted to obtain medical attention, Harris sought to prevent her from driving to the hospital. After this incident, a local court issued a restraining order, barring Harris from contacting his former wife. Over the next several weeks, Harris ignored the order, repeatedly calling her at work and home and attempting to confront her. Several weeks after the initial assault, Harris was found unconscious in front of his ex-wife's front door. Lying beside him was a loaded .357 Magnum revolver and a large quantity of ammunition. Police discovered that Harris had fired one bullet into the ceiling of the house's storage area before passing out from the effects of drugs and alcohol.

Harris's ex-wife was and still is terrified by his violence and menacing letters, and has taken his death threats extremely seriously. She has purchased a gun to protect her home, and has requested that she be informed of Harris's whereabouts when he is sentenced so that she may avoid contact with him. There is also persuasive evidence of Harris's violent behavior toward his previous two spouses, Janet Williams and Jerry Harris. Williams testified at Harris's sentencing hearing that Harris had assaulted her on numerous occasions, usually in explosive fits of delusive jealousy.[9] Similarly, Harris's criminal record reveals that he was convicted of third-degree assault on his second wife, Jerry Harris, in Colorado in 1985.

Based on these factual findings, the court concludes that Harris's base offense level should be enhanced six points because he has engaged in "conduct evidencing an intent to carry out" his threats against his wife. U.S.S.G. § 2A6.1(b)(1). In applying § 2A6.1(b)(1) to Harris's conduct, the court has relied on *United States v. Fonner*, 920 F.2d 1330 (7th Cir.1990). The court in *Fonner* found that the defendant's past violence against a police officer justified a six-point enhancement of his offense level under § 2A6.1(b)(1) for mailing threatening letters to another police officer. Such a defendant, the court observed, "poses a problem in sentencing different from a milquetoast who utters threats out of frustration." *Id.* at 1332–33.[10] As *Fonner* indicates, the "conduct" referred to in § 2A6.1(b)(1) need not involve actions undertaken contemporaneously with or otherwise as part of the threatening communication. The pivotal inquiry is into the defendant's "intent" and "the likelihood that the defendant would carry out the threat." U.S.S.G. § 2A6.1, Background. Conduct by the defendant separate from and previous in time to the threatening communication may bear just as directly on these

---

7. In its findings regarding Harris's previous conduct, the court has relied on his criminal convictions and on testimony at the sentencing hearing in this case by Harris's ex-wife and his first spouse, Janet Williams. Although Harris's own testimony at the hearing was contrary to that of these two witnesses, the court credits their testimony and not his, and finds, by a preponderance of the evidence, that Harris did in fact commit the acts of violence against his past wives described in this section of the court's opinion.

8. Harris's ex-wife also testified that he had assaulted her once previously.

9. Williams divorced Harris in 1981. They had been married for one year, and had previously dated for seven years. The government was compelled to subpoena Williams to appear at the sentencing hearing because, as she testified, she was afraid that Harris would harm her if she offered evidence against him.

10. *See also United States v. Jimenez–Otero*, 898 F.2d 813, 814 (1st Cir.1990).

factors as may actions undertaken as part of a general scheme.[11]

The court feels compelled to add that its individual finding that Harris likely intended to make good on his promises to kill his wife is entirely consistent with statistics on homicides involving battered-women victims and with the patterns of behavior that expert studies have found characterize many cases of domestic abuse. Nearly two million women are severely beaten by their husbands every year in this country. Between 60 and 70 percent of murdered women have been killed by a husband, lover, or ex-lover. When violent men do kill their wives or girlfriends, it is rarely out of the blue, but is usually at the end of an escalating series of ever-more frequent and serious assaults and threats. *See* Gillespie, C., *Justifiable Homicide*, at 11–13, 60, 129, 134–35 (1989); MacKinnon, C., *Feminism Unmodified*, at 24, 52 (1987). Unfortunately—and, ironically, as discussed in the "No Way Out" article which Harris used to terrorize his wife—many of these domestic killings occur after women victims have unsuccessfully sought assistance from police, prosecutors, and the courts. *See* Gillespie, at 135–44. In its decision today, the court has sought, to the best of its ability and within the dictates of the sentencing guidelines, to avoid making this same mistake.

## B. Acceptance of Responsibility

The sentencing guidelines provide for a two-level reduction in a defendant's offense level if he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." Section 3E1.1. A defendant who pleads guilty "is not entitled to a sentencing reduction ... as a matter of right." Section 3E1.1(c). *See also United States v. Jones*, 899 F.2d 1097, 1100 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990). Rather, acceptance of responsibility is a "multifaceted concept," *United States v. Scroggins*, 880 F.2d 1204, 1215 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990), and the inquiry into the applicability of this factor requires consideration of the "total picture." *United States v. Castillo-Valencia*, 917 F.2d 494, 501 (11th Cir.1990). The sentencing judge is in a "unique position" to evaluate whether a defendant has actually accepted responsibility. *Id.* Moreover, because this section of the guidelines serves to reduce the offense level, a defendant bears the burden of establishing its applicability. *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir.1989).

The court has considered the non-exhaustive list of criteria set forth in the sentencing guidelines for determining whether a defendant has accepted responsibility for his crime, and has also examined the Eleventh Circuit's interpretation and application of these criteria.[12] The court is also aware that entry of a guilty plea "with truthful admission of involvement in the offense and related conduct" will constitute "significant evidence" of acceptance of responsibility, but that "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, Application Note 2.

---

11. It would, for example, make little sense to hold one defendant who sends a threatening letter to a public official less culpable than another defendant convicted of a similar offense, where the first individual had several months earlier actually attempted to shoot the official, whereas the second had only bought a gun on the day he wrote his letter.

12. Section 3E1.1, Application Note 1, states that "In determining whether a defendant qualifies for this provision, appropriate considerations include, but are not limited to, the following:

(a) voluntary termination or withdrawal from criminal conduct or associations;

(b) voluntary payment of restitution prior to adjudication of guilt;

(c) voluntary and truthful admission to authorities of involvement in the offense and related conduct;

(d) voluntary surrender to authorities promptly after commission of the offense;

(e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(f) voluntary resignation from the office or position held during the commission of the offense; and

(g) the timeliness of the defendant's conduct in manifesting acceptance of responsibility."

Applying these principles, the court finds that Harris is not entitled to a two-point reduction for acceptance of responsibility. "[O]ther than entering a plea agreement and pleading guilty, [Harris] did little to demonstrate an '*affirmative* acceptance of responsibility.'"[13] *United States v. Campbell*, 888 F.2d 76, 78 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1484, 108 L.Ed.2d 620 (1990) (emphasis in original). Indeed, the court is even more disturbed by Harris's conduct when it considers the remorseless, blame-shifting, rationalizing accounts of these events that he has provided. Harris told his probation officer that he had written the threatening letters as a form of therapy for his angry feelings, on instructions from a psychologist who was treating him. He also explained that he had never intended to send the letters, and that another inmate named "Bill" had mailed them, unbeknownst to Harris.[14] At his sentencing hearing—after the court had announced it was considering denying him a downward adjustment for acceptance of responsibility—Harris finally admitted, in a grudging murmur, that it was he who sent the correspondence.[15] However, he continued to assign responsibility to the prison doctor who had instructed him to write these letters and to blame certain medication he was taking at the time which he said caused him to become confused and depressed. *See Campbell*, 888 F.2d at 78 (no acceptance of responsibility where defendant "denigrated the seriousness" of bank robbery by characterizing it as an "'accident' which resulted from 'joking around'"). *See also United States v. Wallace*, 904 F.2d 603, 606 (11th Cir.1990); *United States v. Rodriguez*, 905 F.2d 372, 374 (11th Cir.1990) (per curiam). More importantly, Harris did not express even a hint of remorse for the death threats or the previous assault on his ex-wife. Instead, he blamed her for the violent episode in Hawaii and, with regard to the letters, insisted that she should have understood that he was simply upset and would never actually hurt her.[16] *See United States v. Crawford*, 906 F.2d 1531, 1534 (11th Cir. 1990) (acceptance of responsibility guideline meant to apply to defendants who "express genuine remorse"). *See also Jones*, 899 F.2d at 1101; *Scroggins*, 880 F.2d at 1215. He also falsely minimized the seriousness of the assault and his subsequent violations of the order restraining him from contacting his former wife, and falsely denied ever striking his ex-wife or two previous spouses on any other occasions.[17] *See Castillo–Valencia*, 917 F.2d at 500 (acceptance of responsibility inquiry must look to defendant's "sincerity"); *Wallace*, 904 F.2d at 605 (same). Indeed, he continues to insist that he wishes to communicate and reconcile with his former wife, despite the fact that she has repeatedly made clear to Harris that she wants no further contact with him. *See Scroggins*, 880 F.2d at 1215 (defendant's "willingness to turn away from" wrongful conduct in future relevant to acceptance-of-responsibility question).

**13.** There is no evidence in this case that Harris did anything but continue to write and mail his threatening letters until he was caught. Moreover, given the overwhelming evidence against Harris and the fact his plea agreement provided for the dismissal of two of the three counts against him, his guilty plea may well have been largely strategic. *See Jones*, 899 F.2d at 1101.

**14.** Harris acknowledges that neither his psychiatrist nor any other prison official authorized him to send death threats to his former wife.

**15.** *See* § 3E1.1, Application Note 1(e) ("timeliness of the defendant's conduct in manifesting the acceptance of responsibility" is relevant factor for court's consideration); *United States v. Spraggins*, 868 F.2d 1541, 1543 (11th Cir. 1989). Even were the court to consider Harris's ultimate acknowledgement that he sent the letters to his wife as a "truthful admission of involvement in the offense," it would still conclude that this and Harris's guilty plea were "outweighed by conduct ... that is inconsistent with ... acceptance of responsibility." Section 3E1.1, Application Note 3.

**16.** Harris claimed that he was angry during this entire period because he had recently learned that his ex-wife was in fact still legally married to her previous husband, and because he and his former wife had become estranged.

**17.** Harris testified that during the incident in Hawaii, he had only slapped his ex-wife and had not prevented her from going to the hospital. He also insisted that he had violated the subsequent restraining order on only one occasion.

In short, Harris has not even begun to recognize the wrongfulness of and harm caused by his actions or the fact that his violent behavior is a chronic problem rather than an isolated aberrational incident. The court concludes that Harris is not entitled to a two-point downward adjustment of his base offense level for acceptance of responsibility.

## III.

Finally, the court's concerns about Harris's violent tendencies, his ex-wife's fears, and the very real possibility that he may again seek to harass or threaten her in the future, lead the court to recommend certain conditions on Harris's imprisonment, and to itself impose similar conditions on his subsequent term of supervised release.[18] These conditions are consistent with the recommendations of the United States Probation Office and the government.[19]

Specifically, the court recommends (1) that Harris's mail and phone privileges be restricted while he is incarcerated so as to insure that he is prevented from communicating with his former wife;[20] and (2) that Harris's ex-wife be notified prior to his release from prison. The court shall also require (3) that as a condition of Harris's supervised release, he have no contact, direct or indirect and either in person, by mail, or by phone, with his former wife.[21]

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That for the purposes of calculating defendant Jessie James Harris's sentence under the federal sentencing guidelines, defendant Harris's offense level shall be enhanced six levels based on the applicability of the specific offense characteristic set forth in section 2A6.1(b)(1) of the United States Sentencing Guidelines;

(2) That for the purposes of calculating defendant Harris's sentence under the federal sentencing guidelines, defendant Harris's offense level shall *not* be reduced two levels based on the adjustment for acceptance of responsibility set forth in section 3E1.1 of the United States Sentencing Guidelines;

(3) That defendant Harris refrain from any contact, direct or indirect, and either in person, by phone, or by mail, with his ex-wife, Rosana Harris, while on supervised release;

(4) That the United States Probation Office is DIRECTED to rely on this order in completing a revised pre-sentence report for defendant Harris;

(5) That it is recommended to the Bureau of Prisons (a) that defendant Harris's mail and telephone privileges be restricted while he is incarcerated so as to insure that he is prevented from communicating with his former wife; and (b) that defendant Harris's ex-wife, Rosana Harris, be notified prior to his release from prison; and

(6) That the clerk of the court is DIRECTED to forward a copy of this order to the appropriate representative of the Bureau of Prisons.

---

**18.** The court is well aware that it has no authority to designate the location or manner in which a defendant is to serve a sentence of imprisonment. However, 18 U.S.C.A. § 3621(b)(4) directs the Bureau of Prisons to consider the sentencing judge's recommendations as to these matters.

**19.** Both the United States Probation Office and the government have proposed that the court require that Harris's former wife be notified before his release, and that he be prohibited

from contacting her while on supervised release.

**20.** The court notes that Harris sent out under the false guise of "legal mail" at least one of the menacing letters received by his former wife's divorce lawyer.

**21.** The court announced that it was contemplating recommending or imposing conditions of exactly this sort at the February 19, 1991 hearing.