United States Court of Appeals,

Eleventh Circuit.

No. 94-4916.

UNITED STATES of America, Plaintiff-Appellee,

v.

Jose FUENTES, Defendant-Appellant.

March 25, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-256-CR-SM), Stanley Marcus, District Judge.

Before TJOFLAT, Circuit Judge, and RONEY and PHILLIPS[*], Senior Circuit Judges.

TJOFLAT, Circuit Judge:

In this appeal, Jose Fuentes challenges the sentence he received in the district court, following a plea of guilty, for conspiring to run a "chop shop" operation.[1] Pursuant to this operation, Fuentes had stolen several Porsche automobiles, had taken them to different locations where he removed many of their parts, and after removing or altering the parts' vehicle identification numbers ("VINs"), had sold the parts to customers throughout the country. Prior to this federal prosecution, Fuentes had been convicted in state court for some of this activity, and at the time of his conviction in the district court, he was serving two concurrent state sentences. The district court sentenced him

---

[*]Honorable J. Dickson Phillips, Jr., Senior U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

[1]A "chop shop" operation involves dismantling stolen automobiles and selling their parts. *See infra* note 4 (citing statutes prohibiting this conduct). Hereinafter, we refer to this criminal activity as "chopping" automobiles.

to a term of sixty months imprisonment consecutive to his two state sentences and ordered him to pay restitution.

In this appeal, Fuentes challenges the court's determination under the federal sentencing guidelines that the federal sentence should run consecutively to the state sentences. He also claims that the order of restitution was erroneous in light of his financial condition. We agree with him on both points and accordingly vacate his sentence and remand for resentencing.

I.

Fuentes has a long criminal history.[2] From his eighteenth birthday in 1976 until 1984, he was arrested at least seven times and convicted five times for various crimes, including battery, carrying a concealed firearm, drug possession, and grand theft.

Beginning in May 1985, his criminal endeavors focused on stealing Porsche automobiles and either selling them intact or stripping them and selling their parts. From May 1985 until January 1986, he stole or attempted to steal at least four different Porsches. He was arrested and convicted of crimes relating to this activity in four separate prosecutions in the Circuit Court for Dade County, Florida. These cases were consolidated for sentencing, and he was sentenced to prison for seven years. He was released when these sentences expired in March

---

[2]We derive the following factual account from the presentence report ("PSR") prepared by the district court's probation office. Neither Fuentes nor the Government objected to the factual findings contained in the PSR, and the sentencing court therefore adopted them as its own findings of fact. *See* Fed.R.Crim.P. 32(b)(6)(D).

1988.

Far from being rehabilitated, Fuentes returned to stealing Porsches and, over time, increased his efforts to make a living running chop shops in South Florida. In August 1989, he stole a Porsche from a shopping center parking lot, brought it to a chop shop, stripped it, removed the VINs, and sold the parts. In June 1990, he chopped another Porsche stolen from the same location. His chop-shop operations hit stride in 1991. In February, he stole a Porsche from a residence and chopped it in a friend's shed. In March and April, he sold parts from three different Porsches to two friends. The VINs had been ground off, and further details about these three thefts are unknown. In the summer of 1991, he rented two warehouses from which to operate his illegal enterprise. During this time, he stole at least twelve Porsches from locations—frequently, but not exclusively, doctor's offices and hospitals—in Miami, Fort Lauderdale, and West Palm Beach. He brought the Porsches to one of the two warehouses and chopped them there. He stole one in June, one in July, four in August, three in September, one in October, and two on unknown dates.

Fuentes sold the stolen parts to bona fide purchasers and to co-conspirators who were aware the parts were stolen. He distributed flyers listing available parts to repair shops and parts stores in the Miami area. He also marketed the parts nationwide, advertising in the classified section of *Hemmings Motor News*. He included his beeper number in the flyers and advertisements.

At some point, both state and federal law enforcement officials became aware of Fuentes' activities. The Metro-Dade Police Department arrested him in August 1990 for the two thefts in 1989 and 1990, and they arrested him again in October 1991 for the February 1991 theft.[3] After each arrest, he was charged by information in the Circuit Court for Dade County, Florida. After Fuentes pled *nolo contendre* in both state cases, that court sentenced him on March 11, 1992, to a total term of imprisonment of twelve years.

On June 4, 1993, a grand jury for the Southern District of Florida indicted Fuentes for his chop shop activities. On April 29, 1994, it returned a superseding indictment, which is now before us. The indictment contained seven counts. Count one charged Fuentes with conspiracy, in violation of 18 U.S.C. § 371, to alter VINs in violation of 18 U.S.C. § 511(a) and to possess with intent to dispose of motor vehicles and parts with altered VINs in violation of 18 U.S.C. § 2321.[4] The grand jury alleged that this conspiracy lasted "[f]rom an unknown date until on or about October

---

[3]Hereinafter we refer to the three Porsches involved in the state cases as the "state Porsches."

[4]Section 371 makes it a crime for "two or more persons [to] conspire ... to commit any offense against the United States." 18 U.S.C. § 371 (1994). Section 511(a) prohibits "knowingly remov[ing], obliterat[ing], tamper[ing] with, or alter[ing] an identification number for a motor vehicle or motor vehicle part." 18 U.S.C. § 511(a)(1) (1994). Section 2321 provides for punishment for anyone who "buys, receives, possesses, or obtains control of, with intent to sell or otherwise dispose of, a motor vehicle or motor vehicle part, knowing that an identification number for such motor vehicle or part has been removed, obliterated, tampered with, or altered." 18 U.S.C. § 2321(a) (1994).

4

21, 1991." Counts two through seven charged Fuentes with substantive violations: five counts under section 2321 and one count under section 511(a).

Fuentes entered into a written plea agreement and, on June 13, 1994, pleaded guilty to count one, the conspiracy count. The district court accepted the guilty plea and, pursuant to the plea agreement, dismissed the remaining six substantive counts of the indictment.

The court then directed its probation office to prepare a PSR. In describing the offense conduct underlying this conviction, the PSR accounted for all the stolen Porsches described above, except the three state Porsches.[5] On August 29, 1994, the court sentenced Fuentes to a term of imprisonment for sixty months (the maximum prison sentence authorized for the conspiracy offense), to run consecutively to the two undischarged state sentences, and three years of supervised release. The court also ordered Fuentes to make restitution in the amount of $357,281. After sentencing, Fuentes was returned to the custody of the State of Florida to serve the remainder of his undischarged state sentences.

Fuentes now appeals from his sentence claiming that under the sentencing guidelines his sentence should run concurrently to the undischarged state sentences and that the order of restitution was improper because the district court "found as fact that Fuentes is indigent and not capable of making restitution in the full amount."

---

[5]Hereinafter we refer to the Porsches involved in the instant prosecution as the "federal Porsches."

5

We agree and therefore vacate his sentence.  We address the merits of his arguments in turn.

II.

Fuentes first claims that the district court erred in ordering that his sentence run consecutively to his undischarged state sentences.  The Sentencing Reform Act of 1984 grants district courts discretion to order that a sentence run concurrently or consecutively to an undischarged term of imprisonment.  *See* 18 U.S.C. § 3584(a) (1994).[6]  In exercising this discretion, the court

---

[6]Before the enactment of the Sentencing Reform Act of 1984, it was widely held that a district court lacked the authority to order a federal sentence to run concurrently with an undischarged state sentence.  *See, e.g., Meagher v. Clark,* 943 F.2d 1277, 1283 (11th Cir.1991) ("[F]ederal jail time [may] be computed only to include such time that the prisoner has served in confinement for the federal offense involved.").

This rule was based on now-repealed 18 U.S.C. § 3568, which provided that a "sentence of imprisonment ... shall commence to run from the date on which [the prisoner] is received at the penitentiary, reformatory, or jail for service of such sentence....  *No sentence shall prescribe any other method of computing the term.*"  18 U.S.C. § 3568 (1982) (emphasis added);  *see Meagher,* 943 F.2d at 1282 ("This court, and others, have uniformly interpreted the language of Section 3568 and its predecessors as precluding the calculation of the time served on a federal charge from any date other than that on which the defendant was delivered to federal prison officials.");  *see also United States v. Segal,* 549 F.2d 1293, 1301 (9th Cir.) ("[T]he district judge has no authority to impose a federal sentence concurrent with a state sentence because a federal term cannot begin until a prisoner has been received by federal authorities.") (citing 18 U.S.C. § 3568), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977).

The Sentencing Reform Act of 1984, which took effect after the defendant in *Meagher* was convicted, repealed this longstanding rule.  Section 3568 was replaced with new §§ 3584 and 3585.  While new § 3585 also provides that a federal sentence commences when the defendant is received into federal custody, *see* 18 U.S.C. § 3585(a) (1994), it is clear that

6

must consider the factors enumerated in 18 U.S.C. § 3553(a) (1994). 18 U.S.C. § 3584(b). These factors, which the court considers whenever imposing a sentence, include the sentencing guidelines. *See* 18 U.S.C. § 3553(a)(4)(A), (5). Pursuant to 28 U.S.C. § 994(a)(1)(D), the United States Sentencing Commission promulgated section 5G1.3 of the sentencing guidelines to guide a district court in determining whether a sentence should run concurrently or consecutively to an undischarged term of imprisonment. *See* United States Sentencing Commission, *Guidelines Manual,* § 5G1.3 (Nov. 1,

---

Congress intended to authorize a district court to order that a federal sentence run concurrently to a state sentence.

The clause prohibiting "any other method of computing the term" was omitted from new § 3585. Furthermore, new § 3584 specifically authorizes a federal sentence to run concurrently to "an undischarged term of imprisonment." 18 U.S.C. § 3584(a). The legislative history for both sections makes Congress' intent clear. *See* S.Rep. No. 98-225, at 129 (1984) ("The Committee ... does not intend that [new § 3585] be read to bar concurrent Federal and State sentences for a defendant who is serving a State sentence at the time he receives a Federal sentence."), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3312; *id.* at 126-27 & nn. 310, 314 (commenting that new § 3584(a) "changes the law that now applies to a person sentenced for a Federal offense who is already serving a term of imprisonment for a State offense" and noting that the new section is intended to overrule *Segal* and similar cases), *reprinted in* 1984 U.S.C.C.A.N. at 3309-10.

That district courts now have authority to impose sentences concurrent to undischarged state sentences has been explicitly recognized by the United States Sentencing Commission, *see* Revisions to the Sentencing Guidelines for the United States Courts, 60 Fed.Reg. 62,289, 62,291-92 (1995), and by other circuit courts of appeals, *see, e.g., United States v. Terrovona,* 785 F.2d 767, 770 (9th Cir.), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 553 (1986), and is expressly acknowledged by this court today.

7

1993).[7]

The district court's determination that Fuentes' sentence should run consecutively to his undischarged state sentences resulted from its application of this guideline to the facts. We therefore review this determination *de novo.* *See United States v. Johnson,* 87 F.3d 1257, 1258 (11th Cir.1996).

A.

Section 5G1.3 contains three different subsections. The first addresses sentencing for an offense committed while the defendant was serving the undischarged term of imprisonment; the second provides the rule for sentences not covered by the first subsection where "the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense"; and the third provides a policy framework for "any other case."[8] It is

---

[7]When reviewing a sentence on appeal, we generally apply the guidelines in effect on the date the appellant was sentenced. *United States v. Shields,* 87 F.3d 1194, 1196 n. 2 (11th Cir.1996) (en banc). However, subsequent amendments that clarify a guideline, rather than make substantive changes, should be considered on appeal regardless of the date of sentencing. *United States v. Stinson,* 30 F.3d 121, 122 (11th Cir.1994).

Because Fuentes was sentenced on August 29, 1994, we apply the guidelines from the 1993 manual. We note that the relevant subsection, § 5G1.3(b), has not been amended since 1993. While § 5G1.3(c) has been amended, that subsection does not apply in the instant case, as we discuss *infra* note 9.

The commentary to § 5G1.3 has been amended, and because we construe these commentary changes as clarifying amendments, we consider the most recent version. Unless otherwise noted, all citations to the guidelines are to the 1993 version.

[8]The full text of § 5G1.3 at the time of appellant's sentencing stated:

undisputed that Fuentes committed the instant offense before the undischarged state sentences were imposed, thus the first subsection clearly does not apply. Fuentes contends that the second subsection, section 5G1.3(b), controls the instant case, while the Government argues that this subsection does not apply and that the third subsection governs.[9]

Section 5G1.3(b) dictates that a federal sentence run concurrently to an "undischarged term of imprisonment [that] resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense." According to the sentencing guidelines' commentary, this guideline

> (a) If the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status) or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment.
>
> (b) If subsection (a) does not apply, and the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment.
>
> (c) (Policy Statement) In any other case, the sentence for the instant offense shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense.

[9]As a fall back argument, Fuentes also argues that even if § 5G1.3(c) controls, that subsection requires a concurrent sentence. The Government argues that § 5G1.3(c) granted the district court discretion to order the sentence to run consecutively. Because we find that § 5G1.3(b) applies, we need not address the proper interpretation of § 5G1.3(c).

9

applies when the undischarged term was imposed for "conduct taken into account in determining the guideline range for the instant offense."  U.S.S.G. § 5G1.3, comment. (n.2) (Nov. 1, 1995).

To illustrate how this guideline is to be applied, the commentary provides the example of a defendant convicted for selling thirty grams of cocaine.  *Id.* At the time of sentencing, the defendant in the example has served six months of a nine-month state sentence imposed for the sale of fifteen grams of cocaine. *Id.* In calculating the defendant's guideline range, the example posits that the fifteen grams of cocaine underlying the state sentence are considered relevant conduct pursuant to U.S.S.G. § 1B1.3,[10] and thus the defendant's offense level is calculated based

---

[10]Section 1B1.3(a) provides that when calculating a defendant's total offense level, the district court should consider the following:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant;  and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

on forty-five grams of cocaine. *Id.* The sentencing court in the example calculates the guideline range to be from ten to sixteen months and determines that the appropriate sentence for the federal conviction is thirteen months. *Id.* The commentary states that proper application of § 5G1.3(b) results in a seven-month sentence (the thirteen months determined by the court minus the six months already served on the state sentence) to run concurrently with the remaining three months of the state sentence.[11] *Id.*

From the guidelines, commentary, and the above example, we conclude that whenever a defendant is subject to an undischarged sentence imposed for criminal activity that section 1B1.3 treats as relevant conduct, section 5G1.3(b) directs the court to impose a sentence that runs concurrently to the undischarged sentence.

## B.

Fuentes argues that the conduct underlying his undischarged

---

> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions;  and
>
> (4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a).  We discuss this section in greater detail *infra* part II.C.

[11]The commentary also suggests,

> For clarity, the court should note on the Judgment in a Criminal Case Order that the sentence imposed is not a departure from the guideline range because the defendant has been credited for guideline purposes under § 5G1.3(b) with six months served in state custody that will not be credited to the federal sentence under 18 U.S.C. § 3585(b).

U.S.S.G. § 5G1.3, comment. (n.2) (Nov. 1, 1995).

11

state sentences (that is, the chopping of the state Porsches) is relevant conduct under section 1B1.3. The Government counters by correctly noting that it did not seek to include the chopping of the state Porsches as relevant conduct when it provided the probation office with information for the PSR. Pursuant to U.S.S.G. § 2F1.1(b)(1), the probation office calculated Fuentes' offense level in part on the basis of the value of the Porsches he had chopped. Because the Government gave the probation office no indication that the chopping of the state Porsches should be treated as relevant conduct, the probation office did not include the value of the state Porsches in calculating Fuentes' offense level. Thus, the Government contends, section 5G1.3(b) does not apply because the conduct underlying the state offenses was not "fully taken into account in the determination of the offense level for the instant offense." In fact, the probation office did not take that conduct into account at all in determining Fuentes' offense level.

The appellant responds to this contention by arguing that his chopping of the state Porsches was *required* to be treated as relevant conduct. He claims that the Government and probation officer intentionally omitted the state Porsches from the calculations to avoid application of section 5G1.3(b). He correctly notes that whether or not the state Porsches were included had absolutely no effect on the sentencing range provided by the guidelines.

Although including the state Porsches would have increased his

12

base offense level, the sentencing range applicable without this increase was 100-125 months (offense level, after adjustments not relevant here, of 24 with a criminal history category of VI). However, the maximum sentence authorized for the instant offense was only 60 months, *see* 18 U.S.C. § 371, well below the range provided by the sentencing guidelines table. Thus, with or without the state Porsches, the guideline sentence was 60 months. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

The essence of Fuentes' argument is that the "fully taken into account" requirement of section 5G1.3(b) is satisfied when the undischarged term resulted from an offense that section 1B1.3 requires to be included as relevant conduct, regardless of whether the sentencing court actually took that conduct into account. We agree.

The purpose of both sections 5G1.3(b) and 1B1.3 is to provide one, uniform punishment for the same criminal activity. We have noted that the guidelines provide for punishment not just for the "offense of conviction," but for all "offense conduct," which "refers to the totality of the criminal transaction in which the defendant participated and which gave rise to his indictment, without regard to the particular crimes charged in the indictment." *United States v. Scroggins,* 880 F.2d 1204, 1209 n. 12 (11th Cir.1989), *cert. denied,* 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d

13

946 (1990); *see also United States v. Flowers,* 13 F.3d 395, 397 (11th Cir.1994) (per curiam) ("The intended purpose of section 5G1.3(b) is to effectively "credit[ ] for guidelines purposes' defendants who have already served time—generally in another jurisdiction—for the same conduct or course of conduct.") (quoting U.S.S.G. § 5G1.3, comment. (n.2)).

This principle underlies the Supreme Court's recent opinion in *Witte v. United States,* --- U.S. ----, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995), in which the Court held that consideration of prior convictions as relevant conduct in calculating a guideline sentence does not violate the Double Jeopardy Clause. The Court stated:

> [Section] 5G1.3 of the Guidelines attempts to achieve some coordination of sentences imposed in ... situations [where a defendant is prosecuted in more than one jurisdiction for the same criminal course of conduct] with an eye toward having such punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time (i.e., had all of the offenses been prosecuted in a single proceeding).
>
> Because the concept of relevant conduct under the Guidelines is reciprocal, § 5G1.3 operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence.... Significant safeguards therefore protect [a defendant] against having the length of his sentence multiplied by duplicative considerations of the same criminal conduct....

*Id.* at ---- - ----, 115 S.Ct. at 2208-09 (citations omitted); *see also id.* at ----, 115 S.Ct. at 2213 (Stevens, J., concurring in part, dissenting in part) ("The Guidelines will generally ensure that the total sentence received in ... two proceedings [involving prosecutions for the same course of conduct] is the same sentence that would have been received had both offenses been brought in the same proceeding.").

14

Assuming for the moment that the district court *could* have considered the chopping of the state Porsches as relevant conduct under section 1B1.3,[12] we conclude that the Government deliberately refrained from portraying Fuentes' chopping of the state Porsches as relevant conduct for one reason—to manipulate the application of the guidelines so that his federal sentence would run consecutively to the state sentences. That inclusion of the state Porsches would have had *absolutely no effect* on the length of the guideline sentence makes this conclusion all the more inescapable.

We find such manipulation by the Government contrary to both the letter and spirit of the guidelines. First, section 1B1.3 states that a defendant's offense level "*shall* be determined on the basis of" all relevant conduct. U.S.S.G. § 1B1.3(a) (emphasis added). Thus, intentionally to refrain from considering relevant conduct violates the command of the sentencing guidelines. In a similar context, we suggested that a district court must consider all relevant conduct—even if the defendant entered into a plea bargain suggesting that such conduct would not be considered at sentencing. *See Scroggins,* 880 F.2d at 1214 ("Nor did the Government's agreement to drop count one of appellant's indictment somehow impliedly preclude the district court from considering evidence [that the defendant committed the offense charged in the dropped count]—under guideline sentencing, counsel cannot bind the sentencing discretion of the district judge....").

Second, the guidelines were written to prevent the Government

---

[12]We turn to this inquiry in part II.C, *infra.*

from manipulating indictments and prosecutions to increase artificially a defendant's sentence or sentences for the same criminal conduct. The guidelines state that the Sentencing Commission "has written its rules for the treatment of multicount convictions with an eye toward eliminating unfair treatment that might flow from count manipulation." U.S.S.G. Ch. 1, Pt. A, intr. comment. § 4(a), p.s. The guideline sentencing scheme is designed to avoid "the potential [that] prosecutors [will] influence sentences by increasing or decreasing the number of counts in an indictment." *Id.* Although these comments are directed at count manipulation in a single prosecution, they are equally applicable to manipulation in successive state and federal prosecutions. *See Scroggins,* 880 F.2d at 1214 (indicating that guidelines do not allow prosecutor to "cloak the facts to reach a result contrary to the guidelines' mandate").

Moreover, interpreting section 5G1.3(b) to apply when the undischarged sentence resulted from conduct that was required to be taken into account in determining the defendant's sentence, even if it was not taken into account, is in accord with the sentencing scheme embraced by the guidelines. Guideline sentencing represents a compromise between two competing paradigms of sentencing—"real offense" sentencing and "charge offense" sentencing. *See generally* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest,* 17 Hofstra L.Rev. 1, 8-12 (1988) (describing this compromise as one between "procedural" and "substantive" justice); *see also Scroggins,* 880 F.2d at 1212-13

16

(summarizing the dichotomy between the two systems).  Under a real offense system, the sentencing judge considers all the defendant's conduct surrounding the offense in fashioning a sentence.  A charge offense system, on other hand, bases the defendant's sentence only on the charged offense itself.

The difference between the systems is best understood by considering an example.  Posit a defendant convicted of robbery.  Under a real offense system, the court will fashion a sentence based on the totality of the defendant's conduct in committing the offense.  Thus, a higher sentence will be imposed if the defendant committed the offense in a violent manner, if the robbery was but one episode in a spree of robberies on the same day in the same city, or if the defendant stole an inordinately large amount of money.  Conversely, a lower sentence would be imposed if the defendant committed the offense without violence, if the robbery was an isolated incident, or if only a de minimis amount was stolen.  In other words, the sentence will be tailored to the circumstances of the crime.  The facts to be considered by the court need not be included in the charge for which the defendant was convicted.

Under a charge offense system, however, the defendant will only be sentenced based on the charged offense itself;  the sentence will only reflect the facts essential to the offense of conviction.  In the example, the defendant's sentence would be the same regardless of how he carried out the robbery.

The sentencing guidelines are best described as "closer to a

17

charge system[, but] contain[ing] a significant number of real offense elements." U.S.S.G. Ch. 1, Pt. A, intr. comment. § 4(a), p.s.; *see also Scroggins,* 880 F.2d at 1212-13. As Justice Breyer aptly noted before ascending to the High Court, guideline sentencing is a charge system in that it "looks to the offense *charged* to secure the "base offense level.' " Breyer, *supra,* at 11-12. However, the system draws from the real offense system because "[i]t then modifies that level in light of several "real' aggravating or mitigating factors (listed under each separate crime), several "real' general adjustments ("role in the offense,' for example) and several "real' characteristics of the offender, related to past record." *Id.* at 12; *see also Scroggins,* 880 F.2d at 1213.

The guidelines thus provide a method for uniformly calculating a sentence based, to the extent practicable, on the totality of a defendant's conduct. The Sentencing Commission decided to incorporate elements of real offense sentencing when a defendant faces multiple counts or multiple prosecutions "[i]n order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct." U.S.S.G. Ch. 3, Pt. D, intr. comment. The guidelines state, "Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines." *Id.*

We find that this real offense sentencing approach should apply with equal force to multiple convictions in different

18

jurisdictions. Consequently, when a defendant subject to an undischarged state sentence is subsequently sentenced in federal court, the defendant's aggregate time served (that is, time served in state prison plus time served in federal prison) should not exceed the guideline sentence—assuming no upward departure is appropriate—unless the state sentence "represent[s] additional conduct that is not otherwise accounted for by the guidelines" in determining the federal sentence.

We therefore conclude that when a defendant is serving an undischarged sentence resulting from conduct that is required to be considered in a subsequent sentencing proceeding as relevant conduct pursuant to section 1B1.3, section 5G1.3(b) provides that the subsequent sentence should run concurrently to the undischarged sentence. This conclusion does not end our inquiry, however. We still must determine whether section 1B1.3 requires that Fuentes' chopping of the state Porsches be considered relevant conduct in determining his sentence.[13]

### C.

To determine whether section 1B1.3 requires that Fuentes' chopping of the state Porsches be considered relevant conduct, we follow a somewhat complex chain of cross-references in the guidelines. We begin with section 1B1.3(a), which defines four

---

[13]We note that Fuentes did not object to the sentencing court's (or the PSR's) failure to include the state Porsches as relevant conduct in calculating his offense level. We find that this failure to object should not prejudice his argument on appeal regarding the application of § 5G1.3. By timely objecting to the sentencing court's (and the PSR's) § 5G1.3 determination, he adequately preserved this issue for appeal.

19

categories of relevant conduct.[14]  One category, defined by section 1B1.3(a)(2), applies when sentencing a defendant for an offense covered by section 3D1.2(d).[15]  Section 3D1.2(d) covers a conspiracy "if the offense that is the object of the conspiracy ... is [also] covered under" that subsection.  U.S.S.G. § 3D1.2, comment. (n.6). Fuentes was sentenced for conspiracy to violate 18 U.S.C. §§ 511(a) and 2321, both of which are covered by section 3D1.2(d).[16]  Section 1B1.3(a)(2) therefore defines relevant conduct for determining Fuentes' sentence.

Section 1B1.3(a)(2) includes as relevant conduct, *inter alia,* all acts committed by the defendant "that were part of the same course of conduct or common scheme or plan as the offense of conviction."  Our complicated journey through the guidelines therefore reveals that the crucial question in this appeal is whether Fuentes' conduct in chopping the state Porsches is "part of the same course of conduct or common scheme or plan as" the instant federal offense—chopping the federal Porsches.  Fortunately, this question is easily resolved.

"Same course of conduct" and "common scheme or plan" are

---

[14]This subsection is quoted in note 10, *supra.*

[15]Section 3D1.2(d), which aggregates closely related counts when sentencing a defendant on multiple counts, covers a long list of Chapter Two guidelines, each of which in turn governs the calculation of the base offense level for specific federal offenses.  In other words, a particular offense is covered by § 3D1.2(d) if the offense level for that offense is governed by a guideline listed in § 3D1.2(d).

[16]The offense levels for these substantive offenses are governed by U.S.S.G. § 2B6.1.  *See* U.S.S.G.App. A. Section 2B6.1 is one of the guidelines covered by § 3D1.2(d).

terms of art defined in the commentary to section 1B1.3. Two offenses form the same course of conduct if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or *ongoing series of offenses*." U.S.S.G. § 1B1.3, comment. (n.9(B)) (Nov. 1, 1995) (emphasis added). In evaluating whether two or more offenses meet this test, the sentencing court should consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.; see also United States v. Maxwell,* 34 F.3d 1006, 1011 (11th Cir.1994) (concluding—before cited commentary was added to guidelines—that court should consider "similarity, regularity, and temporal proximity" of offenses).

We believe that examination of each of these factors firmly establishes that the conduct underlying both the state and federal offenses constitutes the same course of conduct. Both offenses were very similar, if not identical. The Government conceded as much at the sentencing hearing, noting that the state and federal "charges may involve *similar criminal activity,* but it's not the same criminal activity" (emphasis added).

The offenses also were committed with clear regularity and within a very close time period. In a little over three years, the appellant stole and chopped Porsches at least eighteen different times. The last state Porsche was stolen in February 1991, and the first federal Porsche was stolen no later than March 1991. Five of the federal Porsches were stolen at unknown dates in 1991; it is

21

possible that they were stolen before the last state Porsche. Thus, all three factors outlined by the guidelines suggest that the offenses formed an ongoing series of offenses and therefore qualify as the same course of conduct. *See Scroggins,* 880 F.2d at 1211 (agreeing with district court finding that series of thefts from self-service stamp vending machines formed same course of conduct).

Moreover, the offenses also constitute a common scheme or plan. A common scheme or plan refers to offenses "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" U.S.S.G. § 1B1.3, comment. (n.9(A)) (Nov. 1, 1995). We find at least two common factors, although only one is required.

The offenses shared the same purpose—making money by selling stolen Porsche parts to co-conspirators and bona fide purchasers. They also share an identical *modus operandi.* The PSR describes the federal offense conduct as follows: "The defendant's *basic method of operation* revolved around the theft of Porsches, bringing them to a warehouse which he rented as his chop shop premises, and dismantling them inside the warehouse." Fuentes' method of operation for the state offenses, as described in the PSR, was almost identical. The only difference was that Fuentes brought the state Porsches to a residence and his friend's shed, instead of to a rented warehouse; this is a trivial deviation. Chopping the state and federal Porsches clearly constitute a common scheme.

Thus, the state offenses must be considered relevant conduct

22

under section 1B1.3(a)(2) because the state and federal offenses formed both the same course of conduct and a common scheme or plan. The Government's attempts to distinguish the offenses are unconvincing. The Government points out that the offenses involved different Porsches, different victims, and different chop shop locations.[17] While there are differences between the offenses, they are dwarfed by the similarities.

If the maximum prison sentence authorized by 18 U.S.C. § 371 had not been an issue and the Government had sought to include the state offenses as relevant conduct to raise Fuentes' offense level,[18] we cannot imagine that any court would find the offenses unrelated. Surely the Government would complain bitterly if we were to apply the strict test for relevant conduct that it argues for here. That consideration of the state offenses leads to a lesser sentence in this case is no reason to apply a more stringent

---

[17]The Government also asserts that the federal offense involved a different *modus operandi* than the state offenses. It claims that the federal Porsches were all stolen from doctors' offices or hospitals, while the state Porsches were stolen from residences. Although this distinction would make little difference even if accurate, we note that the PSR belies the Government's characterization. It indicates that some of the federal Porsches were also stolen from residences.

[18]We point out that had the Government not agreed to drop the other charges in the indictment and obtained convictions for them, the maximum authorized prison sentence would be easily and properly circumvented by proper application of the guidelines. Even though the maximum prison sentences available for each of the dropped substantive charges might have fallen below the guideline range, the guidelines provide that where "the highest statutory maximum is less than the total punishment [provided by the guidelines], ... the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d).

23

standard.  *Cf. Scroggins,* 880 F.2d at 1213 (noting that "real offense elements do not always work to the disadvantage of a defendant;  in many cases, consideration of these factors will act to reduce an offender's sentence").

We hold that Fuentes' undischarged state sentences resulted from conduct that the guidelines require to be "fully taken into account in the determination of the offense level for the instant offense," and that the district court consequently erred in concluding that section 5G1.3(b) does not require the instant sentence to run concurrently to the state sentences.  *Cf. United States v. French,* 46 F.3d 710, 717 (8th Cir.1995) (finding state perjury conviction and federal fraud and perjury convictions to be relevant, thus warranting concurrent sentences under § 5G1.3(b), because offenses were "based upon actions taken ... during the same time period, in the same general geographic area, for the same purpose, as part of a common plan ..., and involving the same set of ... assets").

D.

Even though the guidelines require a concurrent sentence in this case, the sentencing court is always free to consider an upward departure.  *See* 18 U.S.C. § 3553(b) (1994) (authorizing departure from guidelines if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by ... the guidelines that should result in a sentence different from" the sentence provided by the guidelines).  We have expressly recognized that a court may

24

impose a consecutive sentence where the guidelines call for a concurrent sentence, as long as the court follows the proper procedures for departing from the guidelines. *United States v. Harris,* 990 F.2d 594, 597 (11th Cir.1993) (citing *United States v. Perez,* 956 F.2d 1098, 1103 (11th Cir.1992)).

Although the instant case may well present compelling reasons for an upward departure,[19] the district court made no indication it was departing from the guidelines, nor did it follow the required procedures. *See* 18 U.S.C. § 3553(c)(2) (requiring court to explain in open court reasons for departure from guidelines); *United States v. Valentine,* 21 F.3d 395, 398 (11th Cir.1994) (requiring sentencing judge to give defendant notice that it is considering departure). Thus, Fuentes' sentence clearly resulted from an erroneous interpretation of the guidelines.

---

[19]The court stated at sentencing:

> [T]here are powerful reasons, indeed, why the defendant's sentence in this case should be run consecutive to the State penalty, rather than concurrent....
>
> ....
>
> ...[I]t seems to me under the circumstances of this case that plainly [Fuentes' sentence] ought to be made to run consecutive. I do not see—I could be wrong as I see it, but I do not see this as a difficult or a close question with regard to whether the sentence on the conspiracy ought to be made to run consecutive to a different offense in a different forum.
>
> ....
>
> ...I am satisfied that for all of the reasons that have been stated that his sentence should be made to run consecutive ..., because [that] would achieve a reasonable incremental punishment in this offense, which I think is the touchstone of the analysis.

25

Because the court could have imposed a consecutive sentence had it determined that an upward departure was warranted, we may not direct that Fuentes' sentence run concurrently to the state sentences. Rather, we must vacate the sentence and remand for resentencing. *See United States v. Bell,* 46 F.3d 442, 443 (5th Cir.1995) (remanding on same grounds).

## III.

Fuentes also challenges the district court's order that he pay $357,281 in restitution. He claims that the district court erred in ordering full restitution because he was indigent at the time of sentencing and unlikely to be able to pay the full amount of restitution in the future. Because the record suggests that the district court found that Fuentes was not likely to be able to pay the full restitution amount in the future, we vacate the restitution order and direct the district court to reconsider the issue of restitution.

## A.

Sentencing Guidelines section 5E1.1 directs the sentencing court to order restitution whenever authorized by 18 U.S.C. §§ 3663-3664 (1994). These sections, part of the Victim and Witness Protection Act of 1982 (the "VWPA"), Pub.L. No. 97-291, 96 Stat. 1248,[20] allow district courts to order defendants to pay restitution

---

[20]The provisions for restitution were amended substantially by the Mandatory Victims Restitution Act of 1996, Pub.L. No. 104-132, §§ 201-211, 1996 U.S.C.C.A.N. (110 Stat.) 1227. These new provisions take effect for cases in which the defendant is convicted on or after April 24, 1996. § 211, 1996 U.S.S.C.A.N. (110 Stat.) at 1241. Because Fuentes was convicted before this date, the new act has no application to this case.

to any victim of a Title 18 offense. *See* 18 U.S.C. § 3663(a)(1). To determine the amount of restitution, if any, the sentencing court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a).[21]

An examination of the transcript of the sentencing hearing shows that these factors were considered. The probation officer who had prepared the PSR calculated the total loss to the victims of Fuentes' offense to be $380,781. Defense counsel objected to the inclusion of two victims with losses totaling $13,500, contending that these two victims had conspired with Fuentes.[22] After sustaining these defense objections, the court determined that "full restitution" was $357,281.[23]

Furthermore, defense counsel, the Government, and the probation officer made several arguments concerning Fuentes'

---

[21]We elaborate on these procedures in greater detail in part III.C, *infra.*

[22]Specifically, the two alleged victims had purchased Porsche engines from Fuentes at below-market prices. Due to the low prices, defense counsel suggested, and the Government conceded, that these victims knew, or at least should have known, that they were buying stolen parts and thus did not deserve restitution. This consideration is a good example of a section 3664(a) "other" factor deemed appropriate by the trial court.

[23]Unfortunately, the probation officer, the Government, and the district court appear to have committed multiple mathematical errors in calculating restitution. Because we are vacating the restitution order and remanding for recalculation, we need not address these errors.

27

financial condition and earning capacity. Everyone agreed that Fuentes was indigent and could not pay restitution at the time of sentencing. The focus of most of the testimony at sentencing regarding restitution was on Fuentes' ability to pay restitution in the future, while on supervised release.[24] Defense counsel contended that Fuentes' lack of job skills rendered him unlikely to be able to make full restitution during his period of supervised release. Both the Government and the probation officer argued that the very nature of his crimes showed that he possessed significant mechanical skills that would help him earn a legitimate living and pay restitution following his release.

Defense counsel conceded that some restitution might be appropriate, but argued that ordering full restitution would be improper in light of Fuentes' current financial condition and limited skills. In response to this concern, the probation officer recommended restitution in the full amount suggesting that the probation office could determine how much Fuentes could pay in monthly payments during supervised release. The Government agreed with the probation officer's recommendation and further argued that full restitution was appropriate so that an order would be in place in the admittedly unlikely event that Fuentes did acquire enough money to pay full restitution.

After considering all these arguments, the court ordered

---

[24]The VWPA authorizes the district court to order that restitution be payable within five years after imprisonment. 18 U.S.C. § 3663(f)(2)(B). Good faith compliance with a restitution order is a condition of supervised release. § 3663(g).

restitution in the amount of $357,281. The final judgment stated, "Payments of restitution are to be made as directed by the U.S. Probation Office."[25] In this appeal, Fuentes challenges the amount

[25]Fuentes contends on appeal that the district court may not delegate to the probation office the duty of setting a payment schedule for restitution. His argument finds support in both the text of the VWPA and the majority of cases from other circuits addressing this issue. The VWPA provides, "The [sentencing] court may require that [the] defendant make restitution under this section within a *specified* time or in *specified* installments." 18 U.S.C. § 3663(f)(1) (emphasis added); *see also* U.S.S.G. § 5E1.1, comment. (backg'd) ("The restitution order should specify the manner in which ... payment is to be made.").

Several circuits have found that this language prevents district courts from delegating authority to set payment schedules. *See, e.g., United States v. Graham,* 72 F.3d 352, 356-57 (3d Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1286, 134 L.Ed.2d 230 (1996); *United States v. Porter,* 41 F.3d 68, 71 (2d Cir.1994); *United States v. Ahmad,* 2 F.3d 245, 248-49 (7th Cir.1993). *But cf. United States v. Lilly,* 901 F.Supp. 25, 31-32 (D.Mass.1995) (ordering full restitution but declining to set payment schedule and instead allowing probation office to "assess the defendant's progress toward satisfaction of [restitution]" and to act to revoke supervised release if satisfactory progress is not made), *aff'd,* 80 F.3d 24 (1st Cir.1996).

Other circuits have held that the determination of restitution and payment schedules is a judicial function the delegation of which would violate Article III of the United States Constitution. *See, e.g., United States v. Johnson,* 48 F.3d 806, 808-09 (4th Cir.1995); *United States v. Albro,* 32 F.3d 173, 174 (5th Cir.1994) (applying plain error standard). *But see United States v. Barany,* 884 F.2d 1255, 1260 (9th Cir.1989) (approving delegation under Probation Act of determination of payment schedule for restitution to probation office where court has set "maximum amount of restitution in light of that loss"), *cert. denied,* 493 U.S. 1034, 110 S.Ct. 755, 107 L.Ed.2d 771 (1990).

Notwithstanding the plain language of the statute and the persuasive opinions from our sister circuits, our precedent clearly authorizes delegation of payment schedules to the probation office. *See United States v. Stinson,* 97 F.3d 466, 468 n. 1 (1996) (per curiam) (citing *United States v. Lombardo,* 35 F.3d 526, 528 n. 2 (11th Cir.1994) (per curiam)). As we are bound by precedent, we must reject Fuentes'

of restitution in light of his financial condition. Specifically, he argues that the district court erred in ordering restitution in an amount that the record showed he would unlikely be able to pay either at the time of sentencing or in the future.

B.

The VWPA requires sentencing courts to "consider," *inter alia,* "the financial resources of the defendant, [and] the financial needs and earning ability of the defendant and the defendant's dependents." 18 U.S.C. § 3664(a). Although a sentencing court may order restitution even if the defendant is indigent at the time of sentencing, *United States v. Stevens,* 909 F.2d 431, 435 (11th Cir.1990), it may not order restitution in an amount that the defendant cannot repay. *See United States v. Remillong,* 55 F.3d 572, 574 (11th Cir.1995) (per curiam); *cf. United States v. Apex Roofing of Tallahassee, Inc.,* 49 F.3d 1509, 1514 (11th Cir.1995) (vacating restitution order against dissolved corporation partly because it was not able to pay restitution). A contrary rule would effectively eliminate the mandate of section 3664(a) that the sentencing court consider the defendant's ability to pay.[26]

---

delegation challenge.

[26]Although the primary policy behind orders of restitution is clearly the compensation of victims for their losses, limiting restitution orders to an amount that the defendant can pay serves other important policies. A restitution order in an amount the defendant cannot possibly pay "threatens respect for judicial orders generally." *Remillong,* 55 F.3d at 574 (quoting *United States v. Bailey,* 975 F.2d 1028, 1032 (4th Cir.1992)) (internal quotation marks omitted).

30

In light of this requirement that restitution not exceed the defendant's ability to pay, we must focus on the district court's consideration of Fuentes' ability to pay. We review orders of restitution for abuse of discretion. *See Remillong,* 55 F.3d at 574. A district court abuses its discretion when it orders restitution in an amount that it finds the defendant is not likely to be able to pay. Our review of the record strongly suggests that, although it made no explicit findings regarding ability to pay, the court believed that Fuentes was not likely to be able to pay restitution in the amount ordered.[27]

---

Moreover, an order in an amount well beyond a defendant's means strongly detracts from any hope of rehabilitation for the defendant. *See United States v. Mahoney,* 859 F.2d 47, 52 (7th Cir.1988) ("[I]t is most paramount that the defendant, in the all-important rehabilitative process, have at least a hope of fulfilling and complying with each and every order of the court."). Judge Winter of the Second Circuit has elaborated on this policy:

> A defendant subject to an impossible restitution order may be tempted to pay little or nothing because partial restitution offers no assurance of being considered by the court as satisfaction of the order. As a result, a defendant subject to an impossible restitution order has less incentive to seek remunerative, rehabilitative, and non-criminal employment and to maximize his or her income than a defendant subject to a difficult but doable order.

*Porter,* 41 F.3d at 73 (Winter, J., concurring); *cf. Bearden v. Georgia,* 461 U.S. 660, 670-71, 103 S.Ct. 2064, 2072, 76 L.Ed.2d 221 (1983) ("Revoking the probation of someone who through no fault of his own is unable to make restitution .... may have the perverse effect of inducing the probationer to use illegal means to acquire funds to pay in order to avoid revocation.").

[27]We note that this would be a different case if the record either showed that the court believed Fuentes was able to pay restitution in the amount ordered or gave no indication of its belief on this issue. In imposing an order of restitution, a court need not make an explicit finding that the defendant will be able

31

At the sentencing hearing, the court prefaced the discussion about the amount of restitution by commenting, "I don't know that it's going to make all that much difference in this case." When defense counsel began to point out that Fuentes was indigent, the court interrupted, "All you are saying is it's academic.... I want to find out what the amount is. That's really the thrust of my question." The court also stated that the Government "hardly expect[s] that [Fuentes] is going to ultimately be able to make restitution in the full amount, but ... it's fair and reasonable to require that some restitution be made."

Later in the discussion, defense counsel stated that "based on the Court's statement now—*I think we all agree that he cannot make full restitution,* so we need to find a monetary amount that he can make" (emphasis added). Apparently agreeing with defense counsel's statement that Fuentes could not pay the full amount, but believing that some amount of restitution "does make sense to the victims," the court next asked the Government how to calculate the award in an amount Fuentes would be able to pay. The Government responded,

> It's not really possible to calculate how much the defendant is going to able to repay during his period of supervised release or later on in his lifetime. The State of Florida certainly provides ample legal protection against debtors from having their entire means of living taken by creditors, so I don't think the Court needs to worry about him being oppressed by a large debt.

to make restitution in the amount ordered so long as the record provides sufficient reasons for the decision to order restitution. *Remillong,* 55 F.3d at 576 (citing *United States v. Hairston,* 888 F.2d 1349, 1352-53 (11th Cir.1989)). This form of review is not appropriate where, as here, the record strongly suggests the sentencing court found that the defendant was unlikely to be able to comply with the order.

It is the Government's position that he should be ordered to pay the full amount of restitution, and that while he is on supervised release, his supervised release officer can designate that portion of his income that should be given over to restitution based on how much money he is making and what his obligations are to support himself or any legal dependents, and that the debt should be established so that in the future if [Fuentes] does come into sufficient money to be collectable under the laws of the State of Florida or the United States, then that order will be there and the victims will have their opportunity.

The Government conceded that "[t]here may not be a strong likelihood" that Fuentes would "come into" such a sum of money. Apparently accepting these arguments, the court ordered full restitution.

Taken together, all these statements by the court and counsel convince us that there is at least a strong likelihood that the court ordered restitution in an amount it believed Fuentes was unlikely to be able to pay. The Government's argument that full restitution is nonetheless appropriate may be persuasive, but it is foreclosed by the inclusion of the defendant's ability to pay among the factors the sentencing court must consider. The mere possibility that a defendant will unexpectedly acquire a large sum of money is not sufficient to support an order in an amount he is *unlikely* to be able to pay. *See Remillong,* 55 F.3d at 575 n. 8. As the Third Circuit has noted,

[I]f it is realistic that [the] defendant may inherit a substantial sum from a well-off relative or has a story to write that will be a bestseller, then the district court would be entitled to consider these possible additional sources of income in fashioning a restitution order. On the other hand, we will not put the court in the lottery business.

*United States v. Logar,* 975 F.2d 958, 964 (3d Cir.1992); *see also Mahoney,* 859 F.2d at 51 n. 6 ("The prospect of the defendant's

33

winning a lottery—present in any case—is too remote a possibility to justify [an unreasonably high] restitution order....").

Moreover, the VWPA requires the sentencing judge to consider ability to pay *at the time of sentencing. See United States v. Sasnett,* 925 F.2d 392, 398-99 (11th Cir.1991) (per curiam) (holding that restitution must be determined at sentencing and cannot be postponed, even in light of uncertainty of predicting defendant's future ability to pay). Under the Government's line of reasoning, a sentencing court should order full restitution in every instance, regardless of the financial resources of the defendant.[28] On this point, we find instructive the observation of the Seventh Circuit:

> [H]ad Congress intended that the defendant's ability to pay be considered only after ... nonpayment, it could very easily have mandated that the court direct the payment of full restitution in every case subject to a later revision of the said order should the defendant fail to comply with his payment schedule based upon his financial condition.

*Mahoney,* 859 F.2d at 52.

The VWPA states, "Any dispute as to the proper amount ... of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(d). The defendant bears the

---

[28]Congress apparently adopted this policy in the Mandatory Victim Restitution Act of 1996. Under the new act, the sentencing court may not consider "the economic circumstances of the defendant" when determining the amount of restitution. § 206(a), 1996 U.S.C.C.A.N. (110 Stat.) 1232, 1234 (to be codified at 18 U.S.C. § 3664(f)(1)(A)).

The court will take these factors into account when it determines "the manner in which, and the schedule according to which," the defendant will satisfy the restitution order. *Id.* (to be codified at 18 U.S.C. § 3664(f)(2)). If the defendant cannot pay any amount of restitution, the court may direct him to pay "nominal periodic payments." *Id.* (to be codified at 18 U.S.C. § 3664(f)(3)(B)).

burden of persuasion on the issue of his ability to pay.  *Id.* The

defendant carries this burden when the court finds that the

defendant more likely than not will be unable to pay full

restitution.  To order full restitution in the face of this finding

constitutes an abuse of discretion.  Because our review of the

record strongly suggests that the court made just such a finding,

we must vacate the restitution order and remand for recalculation

in an amount Fuentes is likely to be able to pay. [29]  *See United

States v. Grimes,* 967 F.2d 1468, 1473 (10th Cir.) (vacating

restitution order where sentencing court had stated, "[i]t's, of

course, doubtful that she could pay much or at least any

substantial amount of restitution"), *cert. denied sub nom. McGlynn

v. United States,* 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269

(1992).

## C.

To assist the sentencing court in its task, we briefly discuss

the proper procedures for determining restitution when a defendant

---

[29]Because the court did not expressly find that full
restitution was beyond Fuentes' means, we acknowledge that it is
possible that the court believed Fuentes would be able to pay the
full amount.  We must vacate the order, however, because the record
is not sufficient to clear up this ambiguity.  *Cf. Hairston,* 888
F.2d at 1352-53 (holding that district court should make express
findings of fact where the record "does not provide an adequate
basis for appellate review").

Nothing in this opinion should be interpreted to imply
that we believe the original $357,281 order is or is not, as
a matter of fact, beyond Fuentes' means.  If the court finds
on remand that Fuentes will be able to make full restitution,
that determination would be a factual finding entitled to
clear error review only.

35

alleges that she is unable to pay.[30] The procedural scheme for issuing an order of restitution is set forth in 18 U.S.C. § 3664. As discussed *supra,* the sentencing court must "consider" several factors—most importantly, the amount of loss by any victim of the offense and the defendant's financial condition and ability to pay. 18 U.S.C. § 3664(a).

While the VWPA authorizes the court to order the probation office to gather pertinent information either in the PSR or a separate report made available to both sides, 18 U.S.C. § 3664(b), (c), the statute explicitly allocates between the parties burdens of persuasion with respect to the relevant restitution issues. The Government must prove the amount of loss by a preponderance of the evidence, and the defendant must establish her financial resources and needs by a preponderance of the evidence. 18 U.S.C. § 3664(d). The burden of proving other relevant issues falls "upon the party designated by the court as justice requires." *Id.*

In most cases, the amount of loss will be relatively clear,

---

[30]This discussion only applies to sentencing proceedings in cases in which the defendant was convicted prior to April 24, 1996. As discussed in note 20, *supra,* all other cases are governed by the procedures outlined in the Mandatory Victims Restitution Act of 1996. We provide this discussion to assist the sentencing court on remand of the instant case and to provide guidance for the substantial number of sentencing hearings not covered by the new act.

Two of the major changes are that restitution is mandatory for, *inter alia,* Title 18 crimes against property, § 204(a), 1996 U.S.C.C.A.N. (110) Stat. at 1227-29 (to be codified at 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii)), and that the sentencing judge does not consider the defendant's financial resources at all when determining the amount of restitution, instead accounting for ability to pay when setting the payment schedule, *see supra* note 28.

and the Government will have little trouble carrying its burden. Determining how much restitution the defendant is able to pay is a much more speculative venture; the court must look into the future and predict the defendant's ability to pay. When the defendant is subject to a long prison term, this determination becomes progressively more speculative.

In light of the allocation of burdens of persuasion, there is a presumption that the defendant can pay full restitution. The defendant must present some evidence that she cannot pay full restitution before ability to pay becomes an issue. Because the defendant bears the burden of persuasion, she also bears the risk of nonpersuasion. Thus, while a bald assertion that she is indigent may put her ability to pay at issue, a defendant may not be able to carry her burden without persuasive evidence supporting her claim.

Once the defendant presents evidence suggesting that she cannot pay full restitution, the sentencing court assumes its traditional fact finding role. The court must evaluate not just the probative value of the evidence before it, but also the credibility of any witnesses, particularly the defendant. If the court is not persuaded by the defendant's evidence, or if it finds that the evidence is in equipoise, it is free to order full restitution. Thus, a defendant who is not completely candid with the court and merely asserts that she is indigent faces a formidable risk that full restitution will be ordered.

Where the underlying criminal conduct resulted in substantial

financial gain for the defendant, a strong inference may arise that the defendant has access to the fruits of her crime, or at least proceeds therefrom. She must present convincing evidence to rebut this natural inference. *See United States v. Copple,* 74 F.3d 479, 486 (3d Cir.1996) (Alito, J., concurring) ("All the [illegally obtained] assets for which the defendant cannot account may be included in the amount of restitution ordered. To the extent that records are unavailable, the risk of inaccuracy should be borne by the defendant rather than the victims.").

Although it need not introduce any evidence of ability to pay—again, the defendant bears the burden of persuasion on this issue—the Government often will seek to rebut the defendant's evidence of indigency. It may seek to prove that the defendant has secreted assets or concealed a source of income (for example, a family member who provides the defendant with financial assistance). It may also point to evidence adduced at trial to prove that the defendant is underrepresenting her financial abilities.

If the defendant shows to the satisfaction of the sentencing court that it is more likely than not that she cannot pay full restitution at the time of sentencing, the sentencing court must fashion a restitution order that accounts for her ability to pay.[31]

---

[31]The defendant retains her burden on ability to pay even if she has successfully proven that she cannot be expected to pay full restitution. She bears the burden of proving how much restitution she cannot pay or, depending on one's perspective, how much restitution she can pay. This concept is implicit in the defendant's burden on ability to pay.

While it may solve this problem by simply ordering restitution in a lesser amount or declining to order restitution at all, [32] the better course often will be to set up a payment schedule over time. The VWPA authorizes the court to make restitution payable by a specified date or to set a schedule of installments. 18 U.S.C. § 3663(f)(2).

There are statutory limits to the deadline by which full payment must be made. If the court sentences the defendant to probation, it must require that the full amount of restitution ordered be paid by the end of the period of probation. 18 U.S.C. § 3663(f)(2)(A). When no probation is ordered, the court must require restitution within five years of the end of the term of imprisonment imposed, or if no imprisonment is imposed, within five years of the date of sentencing. 18 U.S.C. § 3663(f)(2)(B), (C). The sentencing court must fashion a restitution order so that the defendant reasonably will be able to comply with the order within the statutorily mandated time period.[33] *See Remillong,* 55 F.3d at

---

[32]While the court may decline to order any restitution in light of the defendant's financial condition, *Stevens,* 909 F.2d at 435, restitution even in a small amount is favored, *see* 18 U.S.C. § 3553(c) (1994) (requiring court to explain why partial or no restitution is ordered); U.S.S.G. § 5E1.1 (requiring restitution where authorized); *Ahmad,* 2 F.3d at 247 ("When there is doubt about ability to pay, the court should order full restitution.").

The court may also decline to order any restitution if it "determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution ... outweighs the need to provide restitution to any victims." 18 U.S.C. § 3663(d). Again, however, some restitution is favored.

[33]We note that although the sentencing court must determine the amount of restitution in light of the defendant's ability to pay

39

575 & n. 8.

Calculating the exact amount that the defendant will be able to pay within the statutory period may be the most difficult and speculative task facing the sentencing court. The longer the term of imprisonment, the more speculative any prediction of future earnings becomes. However, the VWPA requires that this determination be made at the time of sentencing. *See Sasnett,* 925 F.2d at 398-99. The task is not impossible, nor is it a duty for which district courts are unprepared. They must make similar determinations when calculating future earnings in tort and employment discrimination cases.

Counterbalancing the speculative nature of this determination are mechanisms that soften the effects of an order that turns out

---

within the time period provided by § 3663(f), the defendant is not automatically "off the hook" at the end of that period. While the court might no longer be able to enforce its order through its contempt power or through revocation of supervised release, the VWPA provides two other methods of enforcement.

> First, the United States can enforce a restitution order "in the manner provided for the collection and payment of fines in subchapter B of chapter 229 of" Title 18 of the United States Code. Subchapter B of chapter 229 provides *inter alia* that a fine is "a lien in favor of the United States upon all property belonging to the person fined." 18 U.S.C. § 3613(a) (1994). This lien becomes unenforceable twenty years after entry of judgment or upon the defendant's death. *See* 18 U.S.C. § 3613(b).

> Second, both the United States and any victim named in the restitution order may enforce the order "in the same manner as a judgment in a civil action." 18 U.S.C. § 3663(h)(1)(B), (h)(2). Presumably, the restitution order may be recorded as a money judgment and thus become a lien on the defendant's property. If so, this form of enforcement would be governed by the statute of limitations applicable to judgment liens.

40

to be beyond the defendant's means.  The sentencing court remains free to modify its order in the future if the defendant's financial condition changes.[34]  *See Stevens,* 909 F.2d at 435.  Moreover, the VWPA expressly provides that district courts must "consider the defendant's employment status, earning ability, financial resources, the willfulness of the defendant's failure to pay, and any other special circumstances that may have a bearing on the defendant's ability to pay."  18 U.S.C. § 3663(g);     *see also Bearden,* 461 U.S. at 672, 103 S.Ct. at 2073 (holding that sentencing court cannot revoke defendant's probation for failure to pay fine or restitution absent finding that defendant was responsible for failure to pay or that no alternative punishment would adequately punish and deter defendant).

This court takes the speculative nature of a sentencing court's prediction of an indigent defendant's future earnings into account by reviewing such determinations with a deferential standard.  *See United States v. Porter,* 90 F.3d 64, 68 (2d Cir.1996) ("Because of the nuanced nature of the decision to impose restitution it makes little sense for an appellate court, significantly more removed from the case than the district court, to scrutinize the decision closely.").  We review any factual finding that the defendant will be able to comply with the

---

[34]Although this modification usually will entail a reduction of the restitution to be paid where a defendant's financial condition worsens, some courts have suggested that the amount may be increased where the defendant's financial condition improves. *See United States v. Mitchell,* 893 F.2d 935, 936 (8th Cir.1990); *Mahoney,* 859 F.2d at 51 n. 6. *But see Porter,* 41 F.3d at 71 (calling this practice into doubt).

restitution order for clear error, *Sasnett,* 925 F.2d at 397, and restitution orders themselves for abuse of discretion, *Remillong,* 55 F.3d at 574.

When the sentencing court makes the restitution determination by following the procedures discussed here, its determination rarely will be disturbed on appeal. A quick review of the record of the sentencing hearing will reveal whether the court followed these procedures. If the defendant raises an ability-to-pay objection at sentencing, the record must show that the sentencing court considered all relevant evidence of the defendant's financial resources as well as the financial needs of the defendant and her dependents. *United States v. Page,* 69 F.3d 482, 493 (11th Cir.1995). If the court finds that the defendant likely will be able to pay restitution in the amount ordered, its finding will be reviewed only for clear error. Even if it does not make an explicit finding, its order will be affirmed so long as the record supports a finding that the defendant likely will be able to pay restitution in the amount ordered. *Hairston,* 888 F.2d at 1353. Finally, where the record suggests that the court found as a matter of fact that the defendant would not be able to make restitution in the amount ordered, as the record in the instant case suggests, the order will be vacated as an abuse of discretion.

## IV.

For the foregoing reasons, we hold that the district court erred in ruling that the sentencing guidelines require that Fuentes' sentence run consecutively to his undischarged state

42

sentences and also erred in ordering restitution in an amount it found he unlikely was able to pay.  We therefore VACATE the appellant's sentence and REMAND the case for resentencing in accordance with this opinion.

SO ORDERED.